ORIG...AL

FILED
UNITED STATES DISTRICT COURT
DEN'VE'' ^^! ORADO
DEC - 9 2016
JEFFREY P. COLWELL
CLERK

**IN THE UNITED STATES DISTRICT COURT OF COLORADO**

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.

JAMES A. TORCHIA, CREDIT NATION CAPITAL, LLC, CREDIT NATION ACCEPTANCE, LLC, CREDIT NATION AUTO SALES, LLC, AMERICAN MOTOR CREDIT  LLC, AND SPAGHETTI JUNCTION, LLC,

     Defendants.

16-mc-249

U.S.D.C. Northern District of Georgia, Atlanta Division
Civil Action File No.
1:15-cv-3904-WSD

## NOTICE OF RECEIVERSHIP

COMES NOW, Al B. Hill, as the Court-appointed Receiver (the "Receiver") for James A. Torchia, Credit Nation Capital, LLC, Credit Nation Acceptance, LLC, Credit Nation Auto Sales, LLC, American Motor Credit, LLC and Spaghetti Junction, LLC (collectively the "Defendants") and hereby provides notice of his appointment as Receiver pursuant to 28 U.S.C. § 754 and files with the Clerk a copy of the Complaint [Doc. 1] attached hereto as Exhibit "A"; the Order and Opinion appointing the Receiver [Doc. 66] attached hereto as Exhibit "B"; and the Order Reappointing Al B. Bill as Receiver [Doc. 278] as Exhibit "C."

Respectfully submitted this 7th day of December, 2016.

/s/ Al B. Hill
Al B. Hill, Esq.
Receiver

TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 400
Atlanta, Georgia  30339
Telephone: (770) 434-6868
Facsimile: (404) 434-7376
ahill@taylorenglish.com

# Exhibit "A"

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

            v.                                    Civil Action File No.

JAMES A. TORCHIA,
CREDIT NATION CAPITAL, LLC,
CREDIT NATION ACCEPTANCE, LLC,
CREDIT NATION AUTO SALES, LLC,
AMERICAN MOTOR CREDIT, LLC,
SPAGHETTI JUNCTION, LLC,

                    Defendants.

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission

("Commission" or "SEC") alleges the following:

## OVERVIEW

1.    This matter involves an ongoing offering fraud and Ponzi scheme by

James A. Torchia and various entities that he operates under the "Credit Nation"

umbrella.  Defendants Credit Nation Capital LLC ("CN Capital") and its corporate

affiliates, Credit Nation Acceptance, LLC ("CN Acceptance"), Credit Nation Auto

Sales, LLC ("CN Auto"), American Motor Credit, LLC ("AMC"), and Spaghetti

Junction, LLC (collectively "Credit Nation) are all involved in Torchia's

fraudulent scheme.  The fraud involves two separate investment schemes, and it is

being accomplished through unregistered offerings of securities that Credit Nation

advertises to unsophisticated investors on the radio and in newspapers.

2.    Since 2009, Torchia, through CN Capital (formerly known as Credit

Nation Lending Services, LLC), has raised tens of millions of dollars from

investors who purchased unregistered promissory notes, most of which promised a

9% return.  CN Capital touts the safety of the promissory notes, describing them

to investors as "100% asset backed" and "backed by hard assets dollar for dollar."

3.    CN Capital has generated substantial losses each year since at least 2011,

it has liabilities that dwarf its assets, and it generates insufficient returns on its

investments to cover its cash flow needs.  Contrary to representations made to

investors portraying the Notes as a secure investment capable of generating

reliable investment returns, CN Capital basically operates as an ongoing Ponzi

scheme through which the promised investment returns are paid using new investor money. Neither CN Capital's multi-million dollar per year operating losses nor its massive insolvency have ever been disclosed to investors.

4.     The second investment scheme perpetrated by Credit Nation involves unregistered fractional interests in life settlement contracts ("LS Interests") sold by a separate Credit Nation entity, CN Acceptance,[1] which is also controlled by Torchia. Unlike the investors who hold CN Capital Notes, purchasers of LS Interests are assigned fractional interests in specific life insurance policies. CN Acceptance sells investors a share of a life insurance policy owned by CN Capital, and the investors receive a pro rata distribution from the policy proceeds when the insured dies. CN Acceptance is required to pay the policy premiums for up to two years beyond the insured's projected life expectancy.

5.     LS Interests are sold as stand-alone investments, separate from CN Capital and the Notes. LS Interest purchase documents make no reference to CN Capital, and state that CN Acceptance will pay the policy premiums using a portion of the purchase price. But in practice, Torchia disregards corporate formalities and

---

[1]     Prior to August 2013, LS Interests were sold through CN Capital rather than CN Acceptance.

commingles CN Acceptance's funds with CN Capital's, such that the LS Interests
are now threatened by CN Capital's insolvency. Because Torchia routinely directs
the transfer of CN Acceptance's cash to CN Capital, CN Acceptance lacks the
funds needed to pay the premiums for policies sold to LS Interest holders.

6.     Torchia treats Credit Nation as his personal piggy bank, and he has
transferred millions of dollars to entities he controls to support his and his family's
other businesses. He also pays his personal expenses and those of his other
businesses with Credit Nation funds.

7.     Torchia has transferred hundreds of thousands of dollars directly to
himself. In other words, he has stolen investor money. For instance, between
January 1, 2014 and March 31, 2015, Torchia caused Credit Nation to make net
transfers of more than $750,000 to Spaghetti Junction, LLC, an entity under
Torchia's control that he uses strictly as a conduit of funds. In turn, Spaghetti
Junction transferred approximately $259,000 to Torchia and another $139,000 to
Torchia's wife during that same period.

8.     Emergency relief is important in this case. Credit Nation, on average,
raised in excess of $2 million per month through the sale of Notes and LS Interests
in the first six months of 2015. The Commission believes that additional victims

-4-

are being defrauded on a daily basis. With Torchia's history of misappropriating

funds and the company's massive ongoing operating losses, an asset freeze and

receiver are necessary to gather, preserve and protect whatever assets still exist for

the benefit of the victims of Torchia's schemes.

9.     Moreover, Credit Nation has conceded that the books and records of the

company are "just a mess" and "mind-boggling," so a receiver is needed to

unravel the complicated knot that Torchia has woven and to perform a full,

independent accounting of the use and disposition of investor funds. A receiver

will also need to administer and maintain the insurance-policy assets to avoid

policy lapses and maintain their value while the case proceeds.


## VIOLATIONS

10.   The Defendants have engaged in acts or practices or aided, abetted and

caused, and, unless restrained and enjoined by this Court, will continue to

engage in acts and practices that constitute and will constitute or will aid abet

and cause violations of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the

Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

11. The Defendants have engaged in acts or practices or aided, abetted and caused, and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute or will aid abet and cause violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and subsections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5 (a), (b), and (c)].

12. The Defendants have engaged in acts or practices or aided, abetted and caused, and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute or will aid abet and cause violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

## JURISDICTION AND VENUE

13. The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this

complaint, and transactions, acts, practices, and courses of business of similar

purport and object, for civil penalties and for other equitable relief.

14.   This Court has jurisdiction over this action pursuant to Section 22 of the

Securities Act [15 U.S.C. § 77v], and Sections 21(d), 21(e), and 27 of the

Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

15.   Defendants, directly and indirectly, made use of the mails, and the means

and instrumentalities of interstate commerce in connection with the transactions,

acts, practices, and courses of business alleged in this complaint.

16.   Certain of the transactions, acts, practices, and courses of business

constituting violations of the Securities Act and the Exchange Act occurred in the

Northern District of Georgia.

17.   Defendants, unless restrained and enjoined by this Court, will continue to

engage in the transactions, acts, practices, and courses of business alleged in this

complaint, and in transactions, acts, practices, and courses of business of similar

purport and object.

## THE DEFENDANTS

18.   **James A. Torchia**, age 57, is a resident of Canton, Georgia.  Torchia

has been the CEO of Credit Nation Capital, LLC (f/k/a Credit Nation Lending,

LLC) since its inception in 2008.  Torchia is also the CEO and principal of
Credit Nation's corporate affiliates.  In 2006, the State of Florida issued a
cease-and-desist order against Torchia in connection with the sale of viatical
settlements.  The states of Alabama, Georgia and Tennessee have previously
ordered Torchia to stop selling unregistered viatical securities, although
Alabama and Georgia subsequently vacated their respective orders.  Torchia
claims to have sold a prior viatical business for $19 million, but a bankruptcy
trustee of one of the entities involved in the transaction, and the conservator of
another, have each alleged that the transaction was actually a fraud by Torchia.
*See In re Synergy Acceptance Corp.*, Case No. 11-31712, *Schoenmann v.
Torchia*, Adversary Proceeding No. 12-3156 (Bankr. N.D. Cal.); *American
Pegasus SPC v. Clear Skies Holding Co.*, 1:13-cv-03035 (N.D. Ga.).

19. **Credit Nation Capital, LLC ("CN Capital")** (formerly known as
Credit Nation Lending, LLC) is a Georgia limited liability company with its
principal place of business in Woodstock, Georgia.  CN Capital is not registered
with the Commission in any capacity, and has offered and sold tens of millions
of dollars' worth of promissory notes to investors since shortly after the
company's formation in August 2008.  On September 17, 2014, Credit Nation

-8-

Lending Services, LLC changed its name to Credit Nation Capital, LLC. Torchia is CN Capital's CEO and he owns 72% of the membership units jointly with his son, Jason.

20. **Credit Nation Acceptance, LLC ("CN Acceptance")** is a Texas limited liability company with its principal place of business in Midland, Texas. CN Acceptance, which is not registered with the Commission in any capacity, offers and sells to investors fractional interests in viatical and life settlement contracts. Torchia is CN Acceptance's CEO. CN Acceptance is 100% owned by CN Capital.

21. **Credit Nation Auto Sales, LLC ("CN Auto")** is a Georgia limited liability company with its principal place of business in Woodstock, Georgia that was formed in August 2008. CN Auto operated a used automobile dealership, which is now closed. As of December 31, 2014, CN Auto had received roughly $6.4 million in purported "loans" from CN Capital, which are deemed by CN Capital to be uncollectable. Torchia is the CEO of CN Auto, and he owns 70% of the membership units jointly with his son, Jason.

22. **American Motor Credit, LLC ("AMC")** is a Georgia limited liability company with its principal place of business in Woodstock, Georgia that was

formed in April 2013. AMC is the entity through which CN Capital makes

subprime automobile loans to customers. AMC also services the loans.

Torchia is the CEO of AMC. AMC is 100% owned by CN Capital.

23. **Spaghetti Junction, LLC ("Spaghetti Junction")** is a Nevada limited

liability company that was formed in July 2008. Torchia owns and controls

Spaghetti Junction, and from time to time, he transfers money from CN Capital

and its affiliates to Spaghetti Junction, which he ultimately uses to benefit

himself and family members. Torchia is listed as the manager of Spaghetti

Junction by the Nevada Secretary of State.

### THE FRAUDULENT SCHEME

***The Credit Nation Entities and Investments***

24. Credit Nation raises money from investors through two entities, CN

Capital and CN Acceptance. Torchia controls both entities.

25. Torchia runs CN Capital's affairs from its offices in Woodstock,

Georgia. CN Acceptance has an office in Midland, Texas.

26. CN Acceptance offers and sells LS Interests to investors.

27. CN Capital offers and sells promissory notes to investors.

28.  The companies use multiple bank accounts, which are managed by three of Torchia's employees, Amberly Green, Catrina Tipton and Kim Kruse.

29.  Torchia directed his employees as to how and when to transfer money from and between accounts.

***CN Capital Offers and Sells Unregistered Promissory Notes to Investors***

30.  Since at least January 2009, CN Capital has been offering and selling unregistered promissory notes to investors in a series of private placements, purportedly pursuant to Regulation D. 17 C.F.R. § 230.501 *et seq*. Many of the investors are elderly and/or retired.

31.  Prior to the effective date of the JOBS Act at the end of September 2013, CN Capital raised in excess of $20.5 million in its Regulation D offerings. These notes were not sold through radio and newspaper offerings.

32.  After the effective date of the JOBS Act, in late 2013, CN Capital began advertising the notes and offering them pursuant to a purported exemption from registration under Rule 506(c) under the Securities Act. 17 C.F.R. § 230.506(c). Since it began advertising the notes, CN Capital has raised more than $20 million as a result of additional unregistered note sales.

33. CN Capital advertised and sold three- and five-year notes bearing interest at 9% per annum, compounded and payable quarterly. As of November 2014, CN Capital also began offering five-year, zero-coupon notes bearing interest at 9% per annum, compounded semi-annually.

34. The minimum investment amount for the notes is $50,000, which can be waived or reduced at the discretion of the company. The notes automatically renew for an additional term unless the investor notifies the company in writing, at least ninety days before the scheduled maturity date of the note, of his or her desire to receive payment on the maturity date.

35. Most investors renew their notes at maturity.

36. No additional disclosures are provided to investors in advance of their decision whether or not to let the notes renew.

37. In addition, investors in the quarterly notes have an optional early repayment right, subject to a prepayment penalty. Investors who hold the zero-coupon notes do not have an early repayment option.

38. CN Capital uses a custodian for investors who wish to invest through Individual Retirement Accounts.

39.  CN Capital informs investors that substantially all of the proceeds of the notes are used to purchase subprime automobile loans and life settlement and viatical settlement contracts and to pay related expenses.

40.  The 2013 offering memorandum, which was used from September 2013 through November 2014, states that CN Capital may use its funds to (i) make floor plan loans to affiliated auto dealerships on competitive market terms, (ii) purchase real estate in connection with its business, and (iii) pursue other investments and strategies that are focused on the car loans and life settlements.

41.  The Novemeber 2014 Offering Memorandum, which is still in use, contains similar statements, but it additionally states that the company may engage in credit transactions with affiliates.

42.  CN Capital's offering circular boasts that by investing with it, note holders are "accessing the experience of the managers who have a proven track record originating, procuring and managing these specialized categories of assets."

43.  According to its offering memoranda, CN Capital "expects to generate interest income and long-term capital gains from its investment in the Auto

-13-

Loans and Life Settlements in excess of the interest rate payable on the

promissory notes."

44.   The memoranda also state that the company "expects the pool of Life

Settlements will generally yield about 15% per annum."

45.   The 2013 Offering Memorandum portrays the Auto Loans as highly

profitable, claiming that the company anticipated that "less than one month's

collection of payments on Auto Loans will be sufficient to meet one year's

premiums on Life Settlements held by the Company."

46.   Credit Nation's newspaper advertisements, which have appeared in

Georgia, South Carolina, Texas and California,  generally state, among other

things, that the investment: (i) generates a 9% fixed return with interest paid

quarterly; (ii) is 100% asset backed; (iii) is unaffected by stock market

volatility; and (iv) is suitable for cash or IRA investments.

47.   The radio advertisements have been broadcast in Texas, Georgia and

South Carolina.   According to Torchia, many of the advertisements are played

on the Rush Limbaugh show on AM radio.

48.   The text of one of the radio advertisements is as follows:

Attention investors. My name is Bob Guess. I'm with Credit Nation and I'm here to help. Don't get blindsided by the next stock market correction. Remember the correction in 2008; some investors lost 40 to 50 percent of the money that they had in brokerage and retirement accounts. Well, history tends to repeat itself. It's not too late to lock in your gains and take the stock market risk out of your portfolio. If you need income, we have a blended asset investment that'll pay you nine percent annual return. Your investment is backed dollar for dollar with hard assets and is non-correlated to the stock market. For those who don't need additional income but are looking for growth, we have investments that have historically produced double-digit returns that are also non-correlated to the stock market. Give us a call at 1-800-542-9513, that's 1-800-542-9513. Don't gamble with your financial future. Call us today for an appointment. 1-800-542-9513.

49.  Another radio advertisement stated as follows:

Hello, I'm Bob Guess with Credit Nation. You know, most Americans are tired of bank returns, they're afraid of the run-up in Wall Street, and fed up with misleading claims of returns on annuities and insurance companies. If you're looking for sound investments and security of principal where your money works as hard as you do, give Credit Nation a call. Because of the new JOBS Act passed by Congress there is now a level playing field for investors. With Credit Nation you can earn a nine percent return on your money backed by hard assets dollar for dollar. If you prefer growth over income we have an asset-based product thats averaged double digits historically. Don't put all your eggs in one basket. Call Credit Nation for a free consultation today. It's never been harder to stay ahead of inflation than it is today, so diversify your portfolio. That's the answer. Call us at 1-800-542-9513, that's 1-800-542-9513. Don't gamble with your financial future. Call us today. 1-800-542-9513.

-15-

50.   The asset-backed product that averaged double digit returns, referenced in both radio advertisements, pertain to the LS Interests sold by CN Acceptance, which are described in more detail below.

***CN Acceptance Offers and Sells Unregistered LS Interests to Investors***

51.   CN Acceptance offers and sells fractional interests in life insurance policies originally acquired by CN Capital. LS Interest investors sometimes invest through Individual Retirement Accounts.

52.   Investors who purchase LS Interests through CN Acceptance do not receive an offering memorandum or subscription application.

53.   Instead, CN Acceptance provides purchasers of LS Interests with an investment packet.  The packet contains, among other things, a list of services that CN Acceptance provides and a purchase contract.

54.   From the documents produced in response to Commission subpoenas, it does not appear that CN Acceptance requires investors to certify that they are accredited before purchasing an LS Interest.

55.   In the list of services, CN Acceptance states that it will "monitor when premium payments are due and make premium payments to the insurer."

56.    Likewise, the purchase contract states that "Purchaser acknowledges and agrees that the funds shall be used to purchase the life insurance polic[y], to pay costs and expenses related to such purchase and maintenance of each policy…and to pay the premiums on such life insurance polic[y]." Neither CN Capital nor the Notes are mentioned anywhere in the investment packet.

57.    For each life insurance policy, CN Acceptance establishes a projected life expectancy for the insured. CN Acceptance agrees to pay the premiums on the policy for up to two years after the projected life expectancy. If, at that time, the insured is still alive, then CN Acceptance has the right to require LS Interest investors to make the future premium payments on a pro rata basis (or to have their interest sold "to the highest bidder" by CN Acceptance if they refuse).

**CN Acceptance Commingled Its Assets with CN Capital and Used Funds to Pay Expenses Unrelated to the LS Interests.**

58.    Although CN Capital and CN Acceptance each have had their own bank accounts, Torchia commingles their cash by routinely transferring large amounts among the accounts.

59.  As a result of this commingling, CN Acceptance lacks an independent source of funds with which to continue to pay insurance premiums.

60.  Because of the extensive commingling, CN Acceptance's ability to pay premiums is jeopardized by CN Capital's insolvency, and CN Acceptance has become reliant upon Torchia's ability to raise new money from investors in order to make premium payments.

61.  In other words, money that should be retained by CN Acceptance to cover future premium payments for investors is instead diverted to CN Capital, where it is used, in part, to cover CN Capital's operating deficits.

***CN Capital Sold Promissory Notes and LS Interests to Unaccredited Investors and Failed to Take Reasonable Steps to Verify that Investors were Accredited***

62.  In order to purchase a Credit Nation promissory note, a prospective investor must complete a Subscription Application and Subscription Agreement.  The Subscription Application asks the investor to indicate, among other things, whether he or she is an accredited investor.

63.  Specifically, the investor is asked to check a box indicating that he or she is either  (i) "any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of such investor's purchase,

exceeds US$1,000,000 (excluding the value of your primary residence)"; or (ii) "any natural person who had an individual income in excess of US$200,000 in each of the two most recent years or joint income with that person's spouse in excess of US$300,000 in each of those years and has a reasonable expectation of reaching the same level in the current year."

64.    After advertising the promissory notes and LS Interests to the public, CN Capital failed to take reasonable steps to verify that investors were accredited.  CN Capital essentially allowed investors to self-certify their status by checking a box on a subscription application.  It appears that CN Acceptance did not take even that meager step.

65.    CN Capital and CN Acceptance sold promissory notes and LS Interests to unaccredited investors after the companies began generally soliciting investors.

66.    One such investor ("Investor A"), is a 78 year old retiree and resident of South Carolina.  After seeing a Credit Nation advertisement in his local newspaper in late 2013, he called the telephone number listed in the advertisement.

-19-

67. Thereafter, a Credit Nation representative came to his home and met with him and his wife. The representative ultimately persuaded him to invest $50,000 in a CN Capital promissory note and an additional $50,000 in a CN Acceptance LS Interest.

68. At the time of those investments, Investor A and his wife had a joint income of approximately $35,000 or $40,000. Including the two houses owned by Investor A and his wife, their net worth was approximately $900,000 in late 2013. When the primary residence was excluded, the net worth fell to approximately $400,000.

69. Investor A communicated all of these facts about his income and net worth to the Credit Nation representative prior to investing. Nevertheless, his subscription application has a box checked that says that his net worth exceeds $1,000,000 excluding the value of his primary residence.

70. Investor A never provided the Credit Nation representative with any documentation regarding his net worth or income, and he was not required to do so before investing.

*Torchia, CN Capital and CN Acceptance Misrepresented the Safety of the Investments*

71.   CN Capital and CN Acceptance have continuously led investors to believe the investments are secure and that Credit Nation is profitable.

72.   Despite the representations made to investors, Credit Nation's investment strategy has never been profitable.

73.   The promissory notes are not fully secured by assets.

74.   In early September 2015, outside counsel for Credit Nation produced to the Commission staff non-GAAP financial reports for the company for 2014 (the "2014 Financial Packet") prepared by an independent forensic accountant.

75.   In mid-October 2015, Credit Nation produced a similar set of reports for the first six-months of 2015 (the "2015 Financial Packet").

76.   The 2014 Financial Packet and 2015 Financial Packet confirm that the representations made by the company regarding the safety of the investments and the profitability of its investment strategy are false.

77.   Instead of the notes being "100% asset backed" or "backed by hard assets dollar for dollar," the company's liabilities dwarf its assets and the company has sustained multi-million dollar per year operating losses.  Neither

the financial condition of the company nor its operating losses were ever disclosed to investors.

78. As of December 31, 2014, the company had only about $9 million in assets to pay the then-outstanding roughly $30 million in promissory notes.

79. That insolvency is no better today, and in fact, Credit Nation's losses accelerated during the first six months of 2015.

80. In 2014, the company suffered a net loss of more than $6.1 million.

81. Credit Nation suffered operating losses of more than $4.2 million in the first six months of 2015.

82. During 2014, the company collected an average of $108,472 per month in auto loan proceeds, which was nowhere near enough to pay the more than $2 million in policy premiums for the year, contrary to the claims in the offering memorandum used for most of that year.

83. In short, Credit Nation is staying afloat only because it continues to raise more money from investors, but its precarious financial condition has never been disclosed to those investors and investors have been affirmatively misled about the safety and profitability of Credit Nation's investment strategies.

84.   Torchia had no reasonable basis in fact to believe the statements in the offering memoranda and advertisements.

85.   Torchia knew or was reckless in not knowing that statements in the offering memoranda and advertisements were false.

86.   Torchia knew or was reckless in not knowing that the offering memoranda and advertisements omitted material information about Credit Nation's financial condition that was necessary to make the statements contained therein not misleading.

87.   Torchia had the ultimate authority over the statements made in the offering memoranda and advertisements.

### *Torchia Misappropriated and Misused Investor Funds*

#### Credit Nation Cannot Make Interest Payments to Existing Note Holders Without Raising More Money from New Investors.

88.   The offering memoranda represent that substantially all of the note proceeds will be used to purchase sub-prime auto loans and life insurance policies and to pay related expenses.  The LS Interest investment packet

represents that funds would be held to make premium payments on the underlying policies.

89. Torchia, however, has misused investor funds by paying various expenses to keep the fraudulent scheme afloat, and by transferring funds to affiliated entities for the benefit of Torchia, his other businesses and his family members.

90. As described above, the company is unprofitable and losing money. According to the 2014 Financial Packet, in 2014, CN Capital raised $10,100,914 from the sale of investor notes and CN Acceptance raised another $8,919,629 from the sale of fractional interests in Life Settlements, for a total of $19,020,543.

91. Only $7,613,144 of that amount, however, was used to fund new auto loans or to purchase new life insurance policies.

92. A significant amount of the remaining new investor funds was used to cover the ongoing expenses that otherwise could not have been paid because of the company's $6.1 million operating loss during 2014. Among those expenses was more than $2.7 million in interest and maturity payments made to note investors.

93.  Moreover, Credit Nation's investments did not produce sufficient revenue to cover interest and maturity payments to existing noteholders during either 2014 or the first six months of 2015.

<u>Torchia Treated Credit Nation as His Personal Piggy Bank.</u>

94.  Torchia has used a significant amount of CN Capital funds to benefit himself, his other businesses and family members.

95.  In 2014, CN Capital and AMC made net transfers to CN Auto (the now defunct auto dealership owned by Torchia) in excess of $800,000.

96.  Over time, CN Capital has made purported "loans" to CN Auto, of which more than $6.4 million remains outstanding.  CN Capital deems those loans to be uncollectable.

97.  Although the Offering Memoranda state that CN Capital may make floor-plan loans on competitive market terms to auto dealerships, it does not appear that these "loans" to CN Auto were made pursuant to any such floor-plan financing arrangement.

98.  From January 1, 2014, through March 31, 2015 CN Capital made approximately $777,000 in net transfers to Spaghetti Junction, another Torchia-

controlled entity.  Spaghetti Junction has no business operations and serves strictly as a conduit of funds.

99.  During the same time period, Spaghetti Junction transferred approximately $259,000 to Torchia and $139,000 to Marianne Torchia. Spaghetti Junction also transferred $46,500 to casinos during the period, for unknown reasons.

100. In 2014, Torchia transferred $195,842 of CN Capital funds to Willie's West, LLC ("Willie's West"), which used the funds to purchase a residential home in Canton, Georgia in which Torchia lives.  Spaghetti Junction also transferred hundreds of thousands of dollars to Willie's West.

101. The 2014 Financial Packet described CN Capital's purported "loan" to Willie's West as uncollectable.

102. After Commission staff questioned the purported loan to Willie's West, the 2015 Financial Packet described the Willie's West loan as having been "offset against the Spaghetti Junction loan payable" (*i.e.*, money that Credit Nation purportedly owes to Spaghetti Junction for old loans).

103. CN Capital also has made approximately $140,000 in purported "loans" to an auto dealership owned by Torchia's son. Spaghetti Junction also transferred hundreds of thousands of dollars to that dealership.

104. Over the years, Spaghetti Junction and/or CN Capital have transferred hundreds of thousands of dollars to Sixes Tavern, a restaurant controlled by Torchia.

105. The entities under Torchia's control have extensively commingled funds, and Torchia routinely directed the transfer of funds between the various entities under his control.

106. For many of the transfers between entities under his control, there was no apparent legitimate corporate purpose.

107. Torchia and the entities under his control disregarded corporate formalities.

108. There is no contemporaneous documentation for the vast majority of the purported "loans" between entities under Torchia's control.

109. Torchia used a corporate American Express card to pay tens of thousands of dollars' worth of personal expenses each year. The bill was paid by Credit Nation.

110. Torchia claims personally to have "loaned" large sums to Credit Nation in the past, for which transfers to himself and his other businesses are purportedly repayment. These purported loans are largely undocumented.

111. The offering memoranda describe the notes as "a senior obligation" of CN Capital and prohibit CN Capital from taking on any indebtedness that would be senior to the note holders.

112. None of the millions of dollars' worth of purported related-party "loan" obligations incurred by Credit Nation prior to 2013 were ever disclosed to investors.

## COUNT I—FRAUD

### Violations of Section 17(a)(1) of the Securities Act

### [15 U.S.C. § 77q(a)(1)]

113. Paragraphs 1 through 112 are hereby realleged and incorporated herein by reference.

114. Between in or around 2013 and the present, Torchia, CN Capital and CN Acceptance (the "Offering Defendants"), in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and

indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

115. The Offering Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

116. While engaging in the course of conduct described above, the Offering Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

117. By reason of the foregoing, the Offering Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II—FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act

### [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

118. Paragraphs 1 through 112 are hereby realleged and incorporated herein by reference.

119. Between in or around 2013 and the present, the Offering Defendants, in the offer and sale of the securities described herein, by use of means and

-29-

instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

     a.     obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

     b.     engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities; all as more particularly described above.

120. By reason of the foregoing, Offering Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

**Violations of Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)]and Sections (a), (b), and (c) of Rule 10b-5
thereunder [17 C.F.R. § 240.10b-5 (a), (b), and (c)]**

121. Paragraphs 1 through 112 are hereby re-alleged and are incorporated herein by reference.

122. Between in or around 2013 and the present, Offering Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

      a.   employed devices, schemes, and artifices to defraud;

      b.   made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      c.   engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities;

all as more particularly described above.

123. Offering Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, Offering Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

124. By reason of the foregoing, Offering Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Sections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

## COUNT IV – UNREGISTERED OFFERING SECURITIES

### Violations of Sections 5(a) and 5(c) of the Securities Act
### [15 U.S.C. §§ 77e(a), 77e(c)]

125. Paragraphs 1 through 112 are hereby realleged and are incorporated herein by reference.

126. Offering Defendants offered and sold securities, including promissory notes and LS Interests.

127. Offering Defendants used interstate transportation, communication or mails in connection with the sale of securities.

128. At the time of the offer and sale of securities, no registration statement was in effect as to the securities offered and sold.

129. By reason of the foregoing, Offering Defendants have violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT V – AIDING, ABETTING AND CAUSING

130.    Paragraphs 1 through 117 are hereby restated and incorporated herein by reference.

131.    Torchia, CN Auto, AMC and Spaghetti Junction substantially assisted the violations set forth in Count I above.

132.    Torchia, CN Auto, AMC and Spaghetti Junction knew they were participating in securities law violations when assisting and engaging in transactions with the Offering Defendants.

133.    Torchia, CN Auto, AMC and Spaghetti Junction aided, abetted and/or caused the violations in Count I above.

## COUNT VI – AIDING, ABETTING AND CAUSING

134.    Paragraphs 1 through 112 and 118 through 120 are hereby restated and incorporated herein by reference.

135.    Torchia, CN Auto, AMC and Spaghetti Junction substantially assisted the violations set forth in Count II above.

136.    Torchia, CN Auto, AMC and Spaghetti Junction knew they were participating in securities law violations when assisting and engaging in transactions with the Offering Defendants.

-33-

137.    Torchia, CN Auto, AMC and Spaghetti Junction aided, abetted and/or caused the violations in Count II above.

## COUNT VII – AIDING, ABETTING AND CAUSING

138.    Paragraphs 1 through 112 and 121 through 124 are hereby restated and incorporated herein by reference.

139.    Torchia, CN Auto, AMC and Spaghetti Junction substantially assisted the violations set forth in Count III above.

140.    Torchia, CN Auto, AMC and Spaghetti Junction knew they were participating in securities law violations when assisting and engaging in transactions with the Offering Defendants.

141.    Torchia, CN Auto, AMC and Spaghetti Junction aided, abetted and/or caused the violations in Count III above.

## COUNT VIII – AIDING, ABETTING AND CAUSING

142.    Paragraphs 1 through 108 and 125 through 129 are hereby restated and incorporated herein by reference.

143.    Torchia substantially assisted the violations set forth in Count IV above.

144.     Torchia knew he was participating in securities law violations when assisting and engaging in transactions with the Offering Defendants.

145.     Torchia aided, abetted and/or caused the violations in Count IV above.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

### I.

A temporary restraining order, preliminary and permanent injunctions enjoining Defendants, their officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5] and Sections 5(a), 5(c), 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e, 77q].

### II.

An order requiring an accounting by Defendants of the use of proceeds of the fraudulent conduct described in this Complaint and the disgorgement by Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

## III.

An order pursuant to Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] imposing civil penalties against Defendants.

## IV.

An order freezing the assets of Defendants pending further order of the Court.

## V.

An order preventing Defendants from destroying or concealing documents until further order of this Court.

## VI.

The appointment of a receiver to take charge of Credit Nation and its affiliates to preserve the value of the Defendants' remaining assets for the benefit of the Defendants' victims.

## VII.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

-36-

## JURY TRIAL DEMAND

The Commission hereby demands a trial by jury as to all issues that may be so tried.

This 10th day of November, 2015.

Respectfully submitted,

/s/ Walter Jospin
Walter Jospin
Regional Director
Georgia Bar No. 405450
jospinw@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

/s/Joshua A. Mayes
Joshua A. Mayes
Senior Trial Counsel
Georgia Bar No. 143107
mayesj@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel:(404) 842-7600
Facsimile: (404) 842-7679

Exhibit "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.                                                      1:15-cv-3904-WSD

JAMES A. TORCHIA, CREDIT
NATION CAPITAL, LLC, CREDIT
NATION ACCEPTANCE, LLC,
CREDIT NATION AUTO SALES,
LLC, AMERICAN MOTOR
CREDIT, LLC, and SPAGHETTI
JUNCTION, LLC,

Defendants.

## OPINION AND ORDER

This matter is before the Court on Plaintiff United States Securities and

Exchange Commission's ("SEC") Second Motion for Preliminary Injunction [20]

("Preliminary Injunction Motion") and Emergency Motion for Temporary

Restraining Order, Asset Freeze, Receiver, and Other Equitable Relief [2] ("TRO

Motion"). Also before the Court is Defendants James A. Torchia, Credit Nation

Capital, LLC ("CN Capital"), Credit Nation Acceptance, LLC ("CN Acceptance"),

Credit Nation Auto Sales, LLC ("CN Auto"), American Motor Credit, LLC

("AMC"), and Spaghetti Junction, LLC's ("Spaghetti Junction") (collectively,

"Defendants") Motion to Dismiss [21].

## I.   BACKGROUND AND FINDINGS OF FACT

### A.   Introduction

This action involves alleged fraudulent schemes operated by Mr. Torchia

and the Defendant entities he controls.  The alleged fraud involves two separate

investment schemes.  In the first, CN Capital raises money to invest in sub-prime

auto loans and life insurance settlements.  ([20.1] at 4).  CN Capital raises the

funds by selling unregistered promissory notes to investors, who are told that they

will receive a 9% "fixed" return and that their promissory notes are "100% asset

backed." (Compl. ¶ 2).  CN Capital tells promissory note investors that it expects

to generate returns from its investments in excess of the 9% interest payable on the

notes.  ([20.1] at 5).  The second involves CN Acceptance, which sells unregistered

fractional interests in life settlement contracts ("LS Interests") to investors.

(Compl. ¶ 4).

The SEC contends that Defendants' own forensic accounting analysis

reveals that their financial situation is dire, CN Capital is insolvent and has been

for years, and that Defendants are attempting to obscure CN Capital's financial

condition.  The SEC argues that Defendants did not disclose CN Capital's

insolvency to investors, in violation of federal securities laws. (See Compl.

¶¶ 10-12). The Complaint alleges that Defendants violated Sections 5(a), 5(c),

17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933, 15 U.S.C. §§ 77a, et

seq. ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934,

15 U.S.C. § 78a, et seq. ("Exchange Act"), and subsections (a), (b), and (c) of Rule

10b-5 under the Exchange Act, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). (Id.

¶¶ 10-12). The SEC asks the Court to "shut down this fraudulent scheme and

appoint a receiver to marshal and liquidate the assets to prevent investors from

losing any more money than they already have as a result of the Defendants[']

fraud." ([20.1] at 18-19).

Defendants argue that the SEC's allegations are based on a

misunderstanding of Defendants' business model and operations. ([61] at 6).

They argue that the SEC's allegation that CN Capital is insolvent relies on a

"non-GAAP,[1] preliminary, cash flow analysis[.]" ([26] at 2). Defendants claim

that the fair market value of life settlements owned by Credit Nation exceeds $40

million, (Defs.' Initial Disclosures [19] at 4), and that taking the fair market value

of these assets into account shows that CN Capital is solvent. Defendants seek

dismissal of this action and oppose an injunction, including because the life

---

[1]      Generally Accepted Accounting Principles.

insurance settlements it sells to investors are not securities, the SEC has not made a

prima facie case that Defendants violated registration requirements or the antifraud

provisions of the federal securities laws, and the SEC failed to provide evidence of

scienter or intent to defraud.  (See, e.g., [26] at 4-13).

> B.    Defendants' Business
>
> > 1.    Overview

Defendant James Torchia is the CEO of CN Capital, CN Acceptance, and

AMC (collectively, "Credit Nation").  ([21.1] at 2).  Although the Credit Nation

entities are separate, they function as a unit.  (Id. at 4).  Mr. Torchia is also the

CEO of CN Auto, a used car dealership that is no longer in operation.  (Id.).

Mr. Torchia owns Spaghetti Junction, through which he loaned Credit Nation

millions of dollars in start-up capital between 2008 and 2011.  (Id. at 3).  The

ownership structure of the various entities under Mr. Torchia's control is depicted

in the following chart provided by the SEC:

4

## OWNERSHIP STRUCTURE



([20.1] at 23).

Credit Nation raises money to invest in (i) sub-prime auto loans and (ii) life insurance settlements. ([20.1] at 4; [21.1] at 3). Credit Nation raises the investment capital by selling three- and five-year promissory notes to investors. ([21.1] at 3). Credit Nation tells promissory note investors that they will receive a 9% fixed return and that their promissory notes are "100% asset backed." ([20.1] at 4-5). Credit Nation tells promissory note investors that Credit Nation expects to generate returns from its investments in excess of the 9% interest payable on the

notes. (Id. at 5).  Credit Nation's advertisements for its promissory notes included the following newspaper advertisements:



([2.10] at CN-SEC-000550, -000553).[2]

---

[2]     Credit Nation also ran radio advertisements containing the following language:

> Hello, I'm Bob Guess with Credit Nation.  You know, most Americans are tired of bank returns, they're afraid of the run-up in Wall Street, and fed up with misleading claims of returns on annuities and insurance companies.  If you're looking for sound investments

Defendants' sub-prime auto loan and life insurance settlement operations are represented in the following chart provided by the SEC:

## CREDIT NATION OPERATIONS



- • * Policies may name Torchia as Beneficiary, who may redirect proceeds to CN Capital.
- • ** Commingled funds are in CN Capital accounts.

and security of principal where your money works as hard as you do, give Credit Nation a call. Because of the new JOBS Act passed by Congress there is now a level playing field for investors. With Credit Nation you can earn a nine percent return on your money backed by hard assets dollar for dollar. If you prefer growth over income we have an asset-backed product thats [sic] averaged double digits historically. Don't put all your eggs in one basket. Call Credit Nation for a free consultation today. It's never been harder to stay ahead of inflation than it is today, so diversify your portfolio. That's the answer. Call us at 1-800-542-9513, that's 1-800-542-9513. Don't gamble with your financial future. Call us today. 1-800-542-9513. ([2.9] at 2).

([20.1] at 24).  These operations are explained in further detail below.

    2.    Defendants' Investments in Sub-Prime Auto Loans

    Credit Nation provides automobile loans (the "Sub-Prime Auto Loans") at high interest rates to individuals with credit problems.  (Id. at 5).  The Sub-Prime Auto Loans are secured by the automobiles purchased with the loan proceeds. (Id.).  Credit Nation's offering materials and advertising circulars describe the steps that it takes to ensure that its Sub-Prime Auto Loans are profitable, such as requiring high down payments and attaching a GPS tracker to each vehicle.  (See, e.g., [2.13] at CN-SEC-000599-560).  Credit Nation tells investors that, in its discretion, it will keep the Sub-Prime Auto Loans and profit from the interest or that it will resell the loans at a profit.  ([20.1] at 5).

    AMC, a subsidiary of CN Capital, makes the investments in Sub-Prime Auto Loans.  (Id.).  AMC originates loans directly from automobile dealerships and also purchases loans.  (Id.).  Many of the Sub-Prime Auto Loans that AMC purchased were from the now-defunct CN Auto, a car dealership controlled by Mr. Torchia. (Id. at 5-6).

    The SEC contends that Credit Nation's investments in Sub-Prime Auto Loans "have never been profitable," (id. at 6), and that it never disclosed its millions of dollars in losses to promissory note investors, (id.).

8

3.    Defendants' Investments in Life Insurance Settlements

Credit Nation also invests in life insurance settlements at a discount to their maturity value—that is, the death benefit of the underlying policy.  Credit Nation buys life insurance policies, either from an insured or from a settlement company that acts as a broker, hoping that the combination of the purchase price and the premiums paid over time will be less than the death benefits that Credit Nation ultimately receives upon the death of the insured.  (Id. at 6-7).

Credit Nation told buyers of its promissory notes that it planned to focus on buying policies with life expectancies in the three-to-four year range, ([2.13] at CN-SEC-000561), and that it expects to receive a 15% return on its portfolio of life insurance settlements, ([2.12] at CN-SEC-042943).

After it purchases a life insurance policy, CN Capital either holds the policy or sells it, in whole or in part, at a markup.  It sells LS Interests through its affiliate, CN Acceptance.  CN Acceptance tells LS Interest investors that it will pay premiums for the life expectancy of the insured, plus two years if the insured lives that long.  (Compl. ¶ 4).  In return, LS Interest investors receive a portion of the death benefit when the insured dies.  (Id.).

The SEC contends that Credit Nation's investments in life insurance settlements have not been profitable, and that Credit Nation has suffered

multi-million dollar operating losses. (Id. ¶¶ 72, 77). The SEC alleges that

Defendants are insolvent and have liabilities that greatly exceed their assets, and

that this financial situation has never been disclosed to investors. (Id. ¶ 77). The

SEC also alleges that Mr. Torchia has misappropriated and misused investor

money through "loans" and transfers between him and the Defendant entities. (Id.

¶¶ 88-112).

Defendants argue that the fair market value of life settlements owned by

Credit Nation exceeds $40 million, (Defs.' Initial Disclosures [19] at 4), and that

their life settlement business is profitable.  Their theory is that when an insurance

policy is purchased, its value is its face value minus the premiums it expects to pay

until the insured dies.  Put another way, if a policy with a face value of $1 million

is purchased for $600,000, its value is $1 million minus estimated premiums

required to be paid to keep the policy in force.  They reject that the value is what

they paid or what a willing purchaser would pay for the policy in an arm's length

purchase.

C.    Procedural History

On November 10, 2015, the SEC filed its TRO Motion.  On

November 13, 2015, the Court held a hearing on the motion. (Minute Entry [13]).

Counsel for both the SEC and Defendants participated in the hearing.

10

(Nov. 13, 2016, Hr'g Tr. [16]).  At the hearing, the Court determined that it

required more information from the parties—and more time—to decide whether

injunctive relief and a receiver were required.  The Court requested the parties to

negotiate a consent order that would preserve the status quo to allow the Court the

opportunity to analyze the parties' positions in more depth.  (See id. at 57:6-10;

57:22-58:1; 59:2-20; 64:12-65:5).  The parties agreed to the Court's request.  (Id.

at 65:10-66:4).

On November 18, 2015, the parties submitted their proposed consent order

[15] ("Consent Order").  The Consent Order provided for, among other things:

(i) a preliminary injunction briefing schedule; (ii) a preliminary injunction

evidentiary hearing; (iii) expedited discovery; (iv) a freeze, pending the Court's

determination of the SEC's preliminary injunction motion, on advertising, offering,

or selling additional promissory notes and on Defendants' transfers of assets or

funds.  On November 20, 2015, the Court entered the Consent Order [17].[3]

On December 1, 2015, the SEC filed its Preliminary Injunction Motion.  The

same day, Defendants filed their Motion to Dismiss.  Defendants move, under

---

[3]     On January 13, 2016, the parties submitted to the Court a second Proposed
Consent Order [53], which extended the terms of their initial Consent Order until
the Court's ruling on the SEC's Preliminary Injunction Motion.  On
January 14, 2016, the Court entered the parties' second Proposed Consent Order as
an order of the Court [55].

Federal Rule of Civil Procedure 12(b)(1), to dismiss the SEC's claims related to

the sale of LS Interests, arguing that the LS Interests are not securities. ([21.1] at

2, 8). Defendants move, under Federal Rule of Civil Procedure 12(b)(6), to

dismiss the SEC's other claims. (Id. at 2).

On January 8 and 9, 2016, the Court held its hearing on the SEC's

Preliminary Injunction Motion. (Minute Entries [51], [52]). The testimony

provided at the hearing is discussed in detail below. On February 1, 2016, the

parties filed their respective post-hearing briefs. ([60], [61]).

D.     Preliminary Injunction Hearing

On January 8 and 9, 2016, the Court held its hearing on the SEC's

Preliminary Injunction Motion. The following individuals testified at the hearing:

Susan Hartman, an accountant hired by Credit Nation to conduct a forensic

accounting of its finances; M. Bryan Freeman, the SEC's life settlement valuation

expert; Defendant James Torchia; Amberly Green, Mr. Torchia's manager of his

personal financial matters and a policy underwriter at Credit Nation; and Jessica

Hardie, Credit Nation's manager of operations. (Tr. of Prelim. Inj. Hr'g [56], [57]

("Tr.")).

1.   <u>Susan Hartman's Testimony and Financial Snapshots</u>

Ms. Hartman was hired by Credit Nation in 2015 in response to the SEC's

investigation into Credit Nation's financial dealings. (<u>See</u> Tr. at 8:18-9:2).  As part

of her responsibilities, she created financial snapshots (the "Financial Snapshots")

of Credit Nation's finances for 2014 and the first six months of 2015.  (<u>Id.</u> at

8:19-23; Pl.'s Ex. 1; Pl.'s Ex. 2).

Ms. Hartman testified that the individuals responsible for accounting at

Credit Nation "were not trained accountants," and that this was unusual for a

company the size of Credit Nation.  (<u>See</u> Tr. at 13:19-22, 14:5-20).  Partly for this

reason, the Financial Snapshots she created are not in accordance with GAAP.

(<u>See</u> <u>id.</u> at 13:7-12; 64:5-21).

Ms. Hartman created the Financial Snapshots using Credit Nation's bank

statements and its internal accounting records.  (Pl.'s Ex. 1 at 1; Pl.'s Ex. 2 at 3-4).

The Financial Snapshots include, for 2014 and 2015:  CN Capital Sources and

Uses, AMC Sources and Uses, Consolidated Sources and Uses (CN Capital and

AMC), CN Auto Sales Sources and Uses, CN Capital Profit and Loss,[4] AMC

Profit and Loss, Consolidated Profit and Loss (CN Capital and AMC), CN Capital

---

[4]    Ms. Hartman testified that the CN Auto Sales Sources and Uses analysis was
not included in the CN Capital and AMC Consolidated Sources and Uses because
CN Auto Sales is not a fully owned subsidiary of CN Capital.  (Tr. at 63:4-8).

Assets and Liabilities, AMC Assets and Liabilities, Consolidated Assets and Liabilities (CN Capital and AMC), and Consolidated Related Party Assets and Liabilities (CN Capital and AMC). (Pl.'s Ex. 1; Pl.'s Ex. 2).

Ms. Hartman testified that, as of December 31, 2014, the face value of all the life insurance settlements that Credit Nation owned, or in which it had an interest—$12,541,372—was less than Credit Nation's total liability on investor notes payable—$29,387,719. (Tr. at 79:25-80:10; see also Pl.'s Ex. 2 at 31). Thus, if all of those life insurance settlement policies matured as of December 31, 2014—well before many of them were expected to mature—Credit Nation still would not have sufficient funds to satisfy its obligations to promissory note holders. (See Tr. at 80:11-17; Pl.'s Ex. 2 at 31).

Ms. Hartman testified that, based on her forensic analysis, the consolidated liabilities of CN Capital and AMC for 2014 were $32,478,510 and its assets were $8,897,858. (Tr. at 79:13-21). The companies had, based on her cash flow analysis, a net loss of $6,164,051 in 2014. (Pl.'s Ex. 2 at 28). Ms. Hartman testified that, for the period January 1, 2015, through June 30, 2015, CN Capital and AMC, on a cash flow basis, had a consolidated net loss of $4,230,251. (Tr. at 94:10-25; see also Pl.'s Ex. 1 at 11). Assuming losses would accumulate at the same rate as they did in the first six months of 2015, CN Capital and AMC would

14

have had, on an annualized basis, a net loss in 2015 of over $8 million—about $2 million more than its losses in 2014. As of June 30, 2015, CN Capital and AMC had total liabilities of $41,902,589 and assets of only $14,996,245. (Tr. at 98:1-22; Pl.'s Ex. 1 at 15). The Financial Snapshots show that, as of June 30, 2015, CN Capital and AMC had a negative total cash flow, and net income. (Pl.'s Ex. 1 at 1-11).

Ms. Hartman testified that one significant difference between the 2015 analysis and the 2014 analysis is that the maturity value of life settlements increased after December 31, 2014. (See Tr. at 96:4-13). This increase was due to Credit Nation's purchase of additional life insurance policies. (Id. at 96:14-15).

Ms. Hartman testified that, based on the analysis she conducted, Credit Nation was operating at a loss in 2014 and 2015, (id. at 125:21-25), that it was not profitable, (id. at 126:6), and that, based on her analysis of Credit Nation's profits and losses from 2014 to 2015, its losses were accelerating, (id. at 126:8-15).

Ms. Hartman noted that, while her Financial Snapshots were not GAAP compliant, a GAAP compliant balance sheet would record "unearned revenue" for policies that Credit Nation sold to investors in the past. (Id. at 67:4-23, 75:10-25, 95:14-25). On a GAAP compliant balance sheet, unearned revenue is a liability. (Id. at 95:19-21).

Ms. Hartman's Financial Snapshots also contain information regarding transfers between Mr. Torchia and the Defendant entities, or other entities he or his relatives control. For instance, Mr. Torchia directed the transfer of hundreds of thousands of dollars to CN Auto, Spaghetti Junction, National Viatical, RiverGreen, Willie West, Jason's Automotive, and Sixes Tavern.[5] (Pl.'s Ex. 1 at 5-6; Pl.'s Ex. 2 at 17-19). Ms. Hartman testified that these kinds of transfers are "not a best practice" and that generally transfers of this sort are done "out of convenience" and because of "cash flow issues." (Tr. at 31:17-33:2).

Further examples of transfers between Mr. Torchia and Torchia-related entities include CN Capital and AMC's 2014 transfers of approximately $1.1 million to CN Auto, Mr. Torchia's now-defunct dealership. (Pl.'s Ex. 2 at 21). At the time of this transfer, CN Auto owed Credit Nation more than $5 million, (Id. at 39 (non-collectable loan to CN Auto of $6.4 million at the end of 2014)), and, as of June 30, 2015, CN Auto owed CN Capital $6,405,593 in loans categorized as "non-collectible." (Pl.'s Ex. 1 at 17). Ms. Hartman testified that, for part of 2014, CN Auto paid the payroll of both CN Auto and AMC. (Tr. 40:14-16). Money also flowed back and forth between Credit Nation and RiverGreen, and Mr. Torchia's

---

[5]     National Viatical, RiverGreen, Sixes Tavern, and Willie West are all Torchia-related entities. (See Tr. at 15:11-13; 23:1-7; 55:20-23; 221:12-15; 224:19-22).

untrained employees "kept track of who owes who for what on [a] spreadsheet." (See id. at 54:9-15). Ms. Hartman also testified that Credit Nation purchased a life settlement policy from Mr. Torchia and then sold the policy to a third party. (Id. at 61:20-25).

2.   M. Bryan Freeman's Testimony

Mr. Freeman testified as the SEC's life settlement[6] valuation expert.[7] He performed an analysis of the ten policies that make up the majority of the death benefits owned by Credit Nation ($67.5 million out of a total $75.1 million) to determine the fair market value of the policies. (Pl.'s Ex. 20; see also Tr. at 159-65). Mr. Freeman testified and provided an analysis showing that the total fair market value of these policies is between $1.5 million and $2.2 million. (Tr. at 164:12-22; Pl.'s Ex. 20). He testified that this analysis does not include overhead costs to manage the policies. (Tr. at 192:6-11). Mr. Freeman also suggested that Credit Nation may not have the ability to pay the premiums on the life insurance policies it owned. (See id. at 188:11-18).

---

[6]   Mr. Freeman explained that life settlements technically differ from "viatical settlements," but that, under Georgia law and in common parlance, the two terms are used interchangeably. (See Tr. at 135:13-136:1).

[7]   On January 7, 2016—the day before the preliminary injunction hearing—Defendants filed their motion to disqualify Mr. Freeman as an expert. ([50]). At the hearing, the Court denied the motion, allowing Defendants to address, on cross-examination, the matters set forth in their motion. (Tr. at 4:8-16).

3.    James Torchia's Testimony

When asked whether he had reviewed Ms. Hartman's Financial Snapshots,

Mr. Torchia stated that he is "not an accountant." (Id. at 270:13-14).  He also

deferred to his "CPAs" when asked whether AMC, which operates the Sub-Prime

Auto Loan portion of Credit Nation's business, was profitable.  (See id. at

270:10-17).[8]

Mr. Torchia believes that he and his company are "the best in the world" at

valuing insurance policies.  (Id. at 211:20-22).  When asked how he determined the

purchase price for life insurance policies, Mr. Torchia struggled to provide a

coherent explanation of his process, and his answers were often evasive and not

responsive.  (See id. at 210:13-211:19; 233:22-239:23).  He stated he buys certain

policies "[b]ecause we feel that the life expectancies in certain areas are off," and

that he is "looking for homeruns and . . . for potential." (Id. at 214:3-20).  He

ultimately explained that his methodology involves applying a factor of 10% to the

policy to determine the cost of insurance.  (See id. at 239:2-23).  He testified that

---

[8]    Mr. Torchia was called by Defendants as a witness in Defendant's case-in-chief.  The evidence presented by the SEC was sufficient to show that Defendants did not have a viable motion to dismiss at the end of the SEC's case-in-chief and Defendants thus were allowed to present evidence on their behalf for the Court's consideration.

Credit Nation has its "own doctors . . . who are better than the life expectancy doctors." (Id. at 214:8-14).

Mr. Torchia was questioned regarding three specific life insurance policies in which he sold or pledged LS Interests to investors, and he was questioned regarding Mr. Freeman's valuation analysis on those three policies. For the first policy, Mr. Torchia sold approximately 70% of the death benefit from a policy issued to an insured named Kahan. The revenue generated by the sale of the LS Interests in the Kahan policy was $977,475.37. (Id. at 246:4-8; Pl.'s Ex. 31). Mr. Freeman calculated that Credit Nation would be required to pay premiums of $1,860,837 on the Kahan policy to keep it in force until the life expectancy estimated by Credit Nation. (Tr. at 250:17-22). Mr. Torchia was asked to multiply the percentage of the death benefit sold by the total premiums required to be paid, and the result was approximately $1,302,000. (Id. at 251:3-18). Mr. Torchia was then asked to subtract $977,475.37—the revenue generated by the sale of approximately 70% of Kahan's death benefit—from the premiums required to be paid on those sold death benefits, and the result was a loss for Credit Nation of approximately $325,000, assuming Kahan lived to the life expectancy Credit Nation estimated. (See id. at 251:3-23). Put another way, assuming Kahan lived to life expectancy, Credit Nation would lose, through paying the required

premiums, $325,000 on its sale of approximately 70% of Kahan's death benefit.

Mr. Torchia attempted to dispute this figure by claiming that Credit Nation

"inherited along with that [Kahan] portfolio . . . 14 million dollars' worth of death

benefit on top of it for free on people that were older." (Id. at 251:24-252:2).

Mr. Torchia, however, could not explain the source of these purported profits, and

he could not identify any policy he claimed was a part of the $14 million four-

policy deal that included the Kahan portfolio. (Id. at 252:3-254:2).

Next, Mr. Torchia sold 41% of the death benefit on a policy issued to an

insured named Sneider. The total revenue generated by the sale of LS Interests in

the Sneider policy was $2,050,000. (Id. at 255:2-6; Pl.'s Ex. 43). Mr. Freeman's

calculations showed that the anticipated premiums on the Sneider policy totaled

$6,699,648. (Tr. at 255:19-24). Mr. Torchia performed the same calculations as

above, and the result showed that, if Sneider lived to the life expectancy Credit

Nation calculated, Credit Nation would lose approximately $700,000 on the sale of

those LS Interests. (Id. at 258:9-21). Mr. Torchia again struggled to explain this

loss estimate, claiming, confusingly, that "we inherited 24 million dollars in death

benefit for free. Just pay the premiums." (Id. at 258:24-259:3). Mr. Torchia

conceded that, in numerous cases, life expectancies for policies Credit Nation

20

owned exceeded Credit Nation's estimated life expectancies for those policies.
(See id. at 265:24-267:7).

Mr. Torchia testified that Mr. Freeman's valuation of the value of Credit
Nation's life settlements is incorrect, noting that Mr. Freeman's expertise is in a
different life settlement market than the one in which Credit Nation operates. (Id.
at 219:3-13). Mr. Torchia claimed that he could sell Credit Nation's life settlement
policies "in under three months for at least [$]35 million." (Id. at 219:10-13). He
did not provide any criteria, process, or methodology by which he reached this
valuation.

On cross examination, Mr. Torchia testified that there is an outstanding
$5 million judgment against an entity called National Viatical, for which judgment
Mr. Torchia is jointly liable. (Id. at 272:12-14). When asked how he would satisfy
the judgment, Mr. Torchia stated he would not take money from Credit Nation to
pay the judgment, and that he "intend[s] to fight it to the death." (Id. at
272:21-273:10). Mr. Torchia also offered testimony to the effect that he maintains
discretion to decide how Credit Nation operates financially, including by loaning
money to related entities and engaging in a variety of transactions Mr. Torchia
decides are appropriate. (See id. at 216:17-217:2; 221:16-25; 222:9-23; 272:1-16).

When questioned about Credit Nation's representations to investors that life settlements and Sub-Prime Auto Loans would generate sufficient revenue to pay 9% interest on the promissory notes, Mr. Torchia stated "we didn't represent that. . . .  We represented that we are going to enter into the auto loans and policies . . . [b]ut we also have other revenue streams." (Id. at 275:25-276:6).  He stated that "[w]e will get there.  We have generated [a] lot in buying and selling loans.  We just, you know, we haven't—we haven't had as much money to do the auto loans as we would like to.  But we are just about there right now." (Id. at 276:7-10).

Mr. Torchia testified that Credit Nation reported losses in 2011, 2012, and 2013. (Id. at 271:2-8).  He testified that Defendants "told [investors] we could run at a loss.  And I don't think it's my duty to tell [investors] that we are running at a loss." (Id. at 277:23-278:3).

When questioned whether he sometimes used the company credit card to pay for Sixes Tavern's expenses, he stated that, "if it's used by the Sixes Tavern, it gets paid back by Sixes Tavern, or it gets reduced off of my deficit, but it gets paid back." (Id. at 221:16-23).  When asked whether these transactions were accounted for, he answered "[y]eah, I believe so." (Id. at 221:24-25).  When asked a similar question regarding whether "Credit Nation accounts for monies flowing back and

forth from Credit nation to RiverGreen," he stated that his "bookkeepers do that, bookkeepers and the people that handle the account." (Id. at 223:20-23). He reiterated that he is "just not a very good accountant. We have outside CPAs that were brought in to set up the systems that were in place . . . . Accounting is not my strong suit." (Id. 223:25-224:6). He did not testify that trained or certified accountants are usually employed by Credit Nation.[9]

### 4.    Amberly Green's Testimony

Ms. Green, Mr. Torchia's manager of his personal financial matters and a policy underwriter at Credit Nation, testified that, based on her understanding of Mr. Torchia's bank accounts and finances, a $5 million judgment against Mr. Torchia would "significantly impact his ability to loan money" to Credit Nation. (Id. at 317:8-22).

Regarding Mr. Torchia's loans to Credit Nation and other entities, Ms. Green testified that there were no loan agreements in place. (Id. at 304:24-305:5). Ms. Green testified that Mr. Torchia loaned $2,964,000 to CN Auto between 2007 and 2013 "in order for it to operate." (Id. at 315:18-316:9).

---

[9]      Despite Credit Nation's mass media advertisements to the public, Mr. Torchia claims he allows only "high-net-worth individuals" to invest in life settlements. (Tr. at 219:10-13). The evidence is undisputed that life settlements are part of the two investments intended to fund notes owned by investors.

When asked to clarify the purpose of the $2,964,000 loan, she testified that she did

not know the exact purpose of Mr. Torchia's loans to CN Auto.  (Id. at

316:16-20).[10, 11]

## II.   DEFENDANTS' MOTION TO DISMISS

The SEC's Complaint alleges that Defendants violated Sections 5(a), 5(c),

17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, Section 10(b) of the

Exchange Act, and SEC Rule 10b-5.  Defendants move, under Federal Rule of

Civil Procedure 12(b)(1), to dismiss the SEC's claims related to the sale of

LS Interests, arguing that the LS Interests are not securities.  ([21.1] at 2, 8).

Defendants move under Federal Rule of Civil Procedure 12(b)(6) to dismiss the

SEC's other claims.  (Id. at 2).

A.   Legal Standards

1.   Federal Rule of Civil Procedure 12(b)(1)

"Attacks on subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) come

in two forms.  'Facial attacks' on the complaint require[ ] the court merely to look

and see if [the] plaintiff has sufficiently alleged a basis of subject matter

---

[10]    The testimony of Ms. Hardie, Credit Nation's manager of operations, had
limited probative value.  The parties do not rely on her testimony in their
post-hearing briefs, and the Court does not rely on it in this Opinion and Order.
[11]    The Court sets out additional facts and allegations below.

jurisdiction, and the allegations in [the] complaint are taken as true for the

purposes of the motion.'" Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511

(5th Cir.1980),[12] cert. denied, 449 U.S. 953 (1980) (citing Mortensen v. First Fed.

Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).  "Factual attacks" are

challenges to the "existence of subject matter jurisdiction in fact . . . and matters

outside the pleadings . . . are considered." Id.

The Court, having reviewed the arguments presented by both parties,

determines that Defendants' Rule 12(b)(1) Motion to Dismiss is a facial attack.

The Court thus considers the allegations in the Complaint as true for the purposes

of the motion.  Menchaca, 613 F.2d at 511.

     2.    Federal Rule of Civil Procedure 12(b)(6)

On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure, the Court must "assume that the factual allegations in the

complaint are true and give the plaintiff[] the benefit of reasonable factual

inferences." Wooten v. Quicken Loans, Inc., 626 F.3d 1187, 1196 (11th Cir.

2010).  Although reasonable inferences are made in the plaintiff's favor,

"'unwarranted deductions of fact' are not admitted as true." Aldana v. Del Monte

---

[12]    In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the
Eleventh Circuit adopted as binding precedent all of the decisions of the former
Fifth Circuit handed down prior to the close of business on September 30, 1981.

Fresh Produce, N.A., 416 F.3d 1242, 1248 (11th Cir. 2005) (quoting S. Fla. Water

Mgmt. Dist. v. Montalvo, 84 F.3d 402, 408 n.10 (11th Cir. 1996)). Similarly, the

Court is not required to accept conclusory allegations and legal conclusions as true.

See Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010)

(construing Ashcroft v. Iqbal, 556 U.S. 662 (2009); Bell Atl. Corp. v. Twombly,

550 U.S. 544 (2007)).

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). Mere "labels and

conclusions" are insufficient. Twombly, 550 U.S. at 555. "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged."

Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). This requires more than

the "mere possibility of misconduct." Am. Dental, 605 F.3d at 1290 (quoting

Iqbal, 556 U.S. at 679). The well-pled allegations must "nudge[] their claims

across the line from conceivable to plausible." Id. at 1289 (quoting Twombly, 550

U.S. at 570).

B.      Analysis

1.      The LS Interests are Securities

As a threshold matter, the parties disagree whether the LS Interests sold by

Credit Nation qualify as securities under Section 2(a)(1) of the Securities Act and

Section 3(a)(10) of the Exchange Act.[13]

The Eleventh Circuit Court of Appeals addressed this issue in

SEC v. Mutual Benefits Corp., 408 F.3d 737 (11th Cir. 2005).  In Mutual Benefits,

the Eleventh Circuit upheld the district court's denial of defendant's motion to

dismiss for lack of subject matter jurisdiction, holding that life settlement contracts

are "investment contracts" under the test set forth by the United States Supreme

Court in SEC v. W.J. Howey Co., 328 U.S. 293 (1946).  408 F.3d at 745.  The

Howey test provides that an investment contract for purposes of the federal

securities laws means "a contract, transaction or scheme whereby a person invests

his money in a common enterprise and is led to expect profits solely from the

efforts of the promoter or a third party . . . ."  328 U.S. at 298-99.

Applying the Howey test, the Mutual Benefits court found that there was no

genuine dispute that the life settlement contracts at issue involved "(1) an

---

[13]      In response to the SEC's first set of requests for admission, Defendants
admitted that the promissory notes offered by CN Capital are securities.  ([48.1] at
3).

investment of money, (2) in a common enterprise, (3) involving the expectation of

profits." 408 F.3d at 742-43. Turning to the remaining element, "whether the

investor's expectation of profits is based 'solely on the efforts of the promoter or a

third party[,]'" the Eleventh Circuit noted that "investment schemes may often

involve a combination of both pre- and post-purchase managerial activities, both of

which should be taken into consideration in determining whether Howey's test is

satisfied." Id. at 743-44. The Eleventh Circuit also noted that many courts "have

found investment contracts where significant efforts included the pre-purchase

exercise of expertise by promoters in selecting or negotiating the price of an asset

in which investors would acquire an interest." Id. at 744 (citing cases). The

Eleventh Circuit concluded:

> The investors here relied on [the defendant] to identify terminally ill
> insureds, negotiate purchase prices, pay premiums, and perform life
> expectancy evaluations critical to the success of the venture. The
> flexible test we are instructed to apply by Howey . . . covers these
> activities, qualifying [the defendant]'s viatical settlement contracts as
> 'investment contracts' under the Securities Acts of 1933 and 1934.

Id. at 745.

Defendants' attempts to distinguish the SEC's allegations here from those at

issue in Mutual Benefits are unconvincing. Defendants first argue that the SEC's

allegations do not satisfy the "common enterprise" prong of the Howey test.

([21.1] at 8). Relying on SEC v. Unique Fin. Concepts, Inc., 196 F.3d 1195 (11th

Cir. 1999), Defendants argue that whether the "common enterprise" prong is met depends on whether the "fortunes of the investor are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties." ([21.1] at 8). They argue here, the SEC alleges investors purchase policies from Credit Nation inventory, and that policies are identified and acquired before an investor ever places an investment with Credit Nation. (Id. at 9 (citing Compl. ¶¶ 4, 51)). Defendants contend their "investors' fortunes are tied directly to market forces (e.g., when a policy matures), not interwoven with the efforts and success of Credit Nation." (Id.).

This argument is meritless. First, that some of Defendants' activities occurred pre-purchase is irrelevant, because "investment schemes may often involve a combination of both pre- and post-purchase managerial activities, both of which should be taken into consideration in determining whether Howey's test is satisfied." Mutual Benefits, 408 F.3d at 743-44. Second, in finding a common enterprise, the Eleventh Circuit in Mutual Benefits noted only that "[t]he investment scheme here involved both horizontal commonality, in that investor money was typically pooled to invest in a viatical settlement and investors shared both the promise of profits and the risk of loss, and vertical commonality in that any profits were tied to the efforts of the promoters." 408 F.3d at 743 n.4. The

29

Eleventh Circuit did not set forth a temporal requirement that the "efforts of the

promoters" must be undertaken after the investor makes the investment.[14]

Here, the Complaint alleges that, as part of the LS Interest scheme:

"investors receive a pro rata distribution from the policy proceeds when the insured

dies"; "CN Acceptance is required to pay the policy premiums for up to two years

beyond the insured's projected life expectancy"; "CN Acceptance establishes a

projected life expectancy for the insured"; if the insured lives more than two years

beyond the projected life expectancy, CN Acceptance may "require LS Interest

investors to make the future premium payments"; CN Acceptance will "monitor

when premium payments are due"; and CN Acceptance provides LS Interest

investors with "a list of services that CN Acceptance provides." (Compl. ¶¶ 4, 53,

55, 57). These allegations show investors shared the promise of profits and the

risk of loss, and that investors' profits were tied to CN Acceptance's life

expectancy projections, their ongoing efforts of monitoring, making premium

payments, and facilitating collection of the benefit upon maturity. The "common

enterprise" prong is satisfied.

---

[14]    The Eleventh Circuit found "frivolous" the defendant's contention that the
"common enterprise" prong was not met, and the Eleventh Circuit relegated to a
footnote its analysis of this prong. Mutual Benefits, 408 F.3d at 743 n.4.

Defendants next argue the allegations in the Complaint do not satisfy the

final Howey prong, which requires that the investor's expectation of profits be

based solely on the efforts of the promoter or a third party.  Defendants argue that

the Complaint does not allege facts analogous to those alleged by the SEC in

Mutual Benefits.  ([21.1] at 9-11).  Defendants note specifically that, in Mutual

Benefits, the defendant, among other activities, "required investors to place money

in escrow before it purchased any interest or engaged in any activities on

[investors'] behalf"; "never asked investors pay additional premiums" "after

policies were purchased"; "recruited doctors to evaluate the health of an insured";

and "monitored the health of the insureds[.]" (Id. at 9-10).  Defendants also argue

that the "SEC does not allege that Credit Nation selects interests specifically for LS

Interest purchasers." (Id. at 10).

The Mutual Benefits decision does not require a complaint to allege these

specific facts.  The Howey test was met in Mutual Benefits because "investors'

expectations of profits . . . relied heavily on the pre- and post-payment efforts of

the promoters in making investments in viatical settlement contracts profitable."

408 F.3d at 744.  In reaching this conclusion, the court did not identify any

individual factor as dispositive.  Instead, the Court simply listed several factors that

supported its conclusion that the final prong was met, including:  "[t]he investors

here relied on [the defendant] to identify terminally ill insureds, negotiate purchase prices, pay premiums, and perform life expectancy evaluations critical to the success of the venture." Id. at 745. The Complaint here alleges that Defendants bought life insurance policies from insureds, paid premiums, performed life expectancy evaluations, and monitored premium payments, among other "services that CN Acceptance provides." (See Compl. ¶¶ 4, 51-57). The Complaint's allegations here track those listed by the court in Mutual Benefits.

The crux of Defendants' argument is that the "the LS Interest purchasers' fortunes relied more on market forces (i.e., insured's health and longevity) than Credit Nation's efforts and success." ([21.1] at 11). This characterization ignores the reality of the investment Defendants offered—an investment that required investors to rely on Defendants to evaluate and purchase insurance policies based on Defendants' analysis of and recommendations regarding "market forces," specifically, insureds' health and longevity. In a real way, Defendants' argument discredits their effort to distinguish this case from Mutual Benefits. Their argument ignores that LS Interest purchasers necessarily relied on Defendants' pre-purchase selection of the insurance policies, and that the Complaint alleges this selection involved, at the very least, life expectancy evaluations. (See Compl. ¶¶ 4, 51-57). As the Eleventh Circuit noted, "investment schemes may often involve a

combination of both pre- and post-purchase managerial activities, both of which

should be taken into consideration in determining whether Howey's test is

satisfied." Mutual Benefits, 408 F.3d at 743-44. The Mutual Benefits Court also

noted:

> [w]hen profits depend upon market forces, public information is
> available to investors by which they can independently evaluate the
> possible success of the investment. In the case before us, investors
> were far more dependent on the efforts and information provided by
> [defendant] than an investor relying on the open market to produce a
> profit.

408 F.3d at 744 n.5. Here, the Court finds that the allegations in the Complaint

show that LS Interest investors were dependent on the efforts and information

provided by Credit Nation and did not rely on the open market to produce a

profit.[15] The LS Interest contracts are "investment contracts" subject to the

Securities Act and the Exchange Act.

### 2.   Violation of Section 5 of the Securities Act

The SEC alleges that Defendants violated Sections 5(a) and 5(c) of the

Securities Act. "Under Section 5 of the Securities Act, securities offered for sale

---

[15]   Defendants rely on SEC v. Life Partners, Inc., 87 F.3d 536 (D.C. Cir. 1996) to show that other courts have found that "ministerial efforts" such as those alleged by the SEC do not convert Life Settlements into investment contracts subject to SEC regulation. ([21.1] at 11). Defendants' reliance is misplaced, because the Eleventh Circuit in Mutual Benefits expressly "decline[d] to adopt the test established by the Life Partners court." 408 F.3d 737.

must be registered by filing a registration statement with the SEC, unless a

statutory exemption to the registration requirement applies." SEC v. Bronson,

14 F. Supp. 3d 402, 407 (S.D.N.Y. 2014) (citing 15 U.S.C. § 77e). "In order to

establish a prima facie case for a violation of § 5 of the Securities Act, the SEC

must demonstrate that (1) the defendant directly or indirectly sold or offered to sell

securities; (2) through the use of interstate transportation or communication and the

mails; (3) when no registration statement was in effect." SEC v. Big Apple

Consulting USA, Inc., 783 F.3d 786, 806-807 (11th Cir. 2015) (quoting

SEC v. Calvo, 378 F.3d 1211, 1214 (11th Cir. 2004)). "Once participation in an

unregistered sale has been shown, the [sellers] have the burden of proving an

exemption to the registration requirements." Id. at 807 (quoting Zacharias v. SEC,

569 F.3d 458, 464 (D.C. Cir. 2009)).

Defendants acknowledge their promissory notes are securities. ([21.1] at 12;

see also [48.1][16] at 3).[17] They argue, however, that the SEC's Section 5 claims

should be dismissed because Credit Nation "was permitted to offer its notes to

---

[16]    The SEC introduced this document into evidence at the preliminary
injunction hearing as Plaintiff's Exhibit 100.
[17]    Defendants admit that CN Capital "used instrumentalities of interstate
commerce in connection with the offer and sale of promissory notes." ([48.1] at
4). Defendants also admit that "[n]o registration statement was in effect with the
Commission as to the promissory notes sold by Credit Nation Capital." (Id.).

unaccredited investors" under Rule 506(c), 17 C.F.R. § 230.506(c), ([21.1] at 13),

essentially contending that the promissory notes are exempt from the registration

requirements.

Defendants have the burden to prove an exemption applies.  Big Apple,

783 F.3d at 807.  "A court may dismiss a claim on the basis of an affirmative

defense raised in the motion to dismiss, only if the facts supporting the defense

appear on the face of the complaint, and it appears beyond doubt that the plaintiff

can prove no set of facts in support of his claim that would entitle him to relief."

Bronson, 14 F. Supp. 3d at 407 (citing United States v. Space Hunters, Inc.,

429 F.3d 416, 426 (2d Cir. 2005)); see also Twin City Fire Ins. Co. v. Hartman,

Simons & Wood, LLP, 609 F. App'x 972, 976 (11th Cir. 2015) ("A complaint may

be dismissed . . . when the existence of an affirmative defense 'clearly appears on

the face of the complaint.'" (quoting Quiller v. Barclays Am./Credit, Inc., 727 F.2d

1067, 1069 (11th Cir. 1984))).

Here, Defendants do not argue that the allegations in the Complaint

conclusively show the promissory notes are exempt from registration.  They argue,

instead, that the SEC does not allege sufficient facts to show that the promissory

notes *are not* exempt from registration.  (See [21.1] at 12-14 ("The SEC also does

not specify when Investor A invested with Credit Nation . . . .  Without more

35

specific information, the . . . Defendants are unable to answer the SEC's

allegations"; "the SEC fails to allege who met with Investor A and secured his

investment . . . third-party verification is not the only way to satisfy the

requirement in Rule 506(c) . . ."; "A sizeable minimum investment *may* also

indicate accredited status depending on other information available to a promoter."

(emphasis added))). The SEC, however, does not have the burden to prove that the

promissory notes are not exempt from registration. It is Defendants' burden to

show the promissory notes are, in fact, exempt. Big Apple, 783 F.3d at 807.

Defendants fail to identify any Complaint allegations clearly showing the

promissory notes are exempt from registration. Defendants' Motion to Dismiss the

SEC's Section 5 claims is denied. See Twin City, 609 F. App'x at 976.

### 3.    Violation of the Anti-Fraud Provisions

Defendants next move to dismiss the SEC's claims that Defendants violated

Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, Section 10(b) of the

Exchange Act, and SEC Rule 10b-5 (collectively, the "Anti-Fraud Provisions").

To establish a violation of Section 10(b) and Rule 10b-5, the SEC must prove by a

preponderance of the evidence that Defendants made "(1) material

misrepresentations or materially misleading omissions, (2) in connection with the

purchase or sale of securities," and that they "(3) made [them] with scienter."

SEC v. Merchant Capital, LLC, 483 F.3d 747, 766 & n.17 (11th Cir. 2007) (citing

Aaron v. SEC, 446 U.S. 680, 695 (1980); SEC v. Zandford, 535 U.S. 813, 816 n.1

(2002)).

A complaint alleging claims under Section 10(b) and Rule 10b-5 must

satisfy the heightened pleading requirements established under Rule 9(b) of the

Federal Rules of Civil Procedure. SEC v. Strebinger, 114 F. Supp. 3d 1321, 1329

(N.D. Ga. 2015) (citing Kammona v. Onteco Corp., 587 F. App'x 575, 581 (11th

Cir. 2014)). To do so, a plaintiff "must state with particularity the circumstances

constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Proof of a violation of Section 17(a)(1) through (3) requires "[e]ssentially

the same elements" in connection with the offer or sale of a security, except that

proof of scienter is not required for the SEC to seek an injunction under Section

17(a)(2) or (3). SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999)

(citing SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996));

see also Merchant Capital, 483 F.3d at 766 (citing Aaron v. SEC, 446 U.S. 680,

697, 702 (1980)).[18]

---

[18]   All of these violations also require proof of an interstate commerce or mails
element. See 15 U.S.C. § 78j(b); 15 U.S.C. § 77q(a). The Complaint alleges,
(Compl. ¶ 15), and Defendants admit, ([48.1] at 4-5), that CN Capital and CN
Acceptance used instrumentalities of interstate commerce in connection with the

The SEC alleges that Defendants[19] misled investors about the safety and profitability of Credit Nation. (See, e.g., Compl. ¶¶ 1, 83). It also accuses Mr. Torchia of misappropriating investor funds, using new investor money to disguise the venture's operating losses, extensively commingling funds among entities under his control, and using the Defendant entities' assets to prop one another up. (See, e.g., id. ¶ 89).

The misleading statements or material omissions alleged in the Complaint include:

- The promissory notes were "100% asset backed" or "backed by hard assets dollar for dollar." (Id. ¶¶ 46, 48, 49).

- CN Capital "expect[ed]" to generate interest income and long-term capital gains from its investments in automobile loans and Life Settlements in excess of the interest payable on the notes. (Id. ¶ 43).

- CN Capital "ancitipat[ed]" that less than one month's collection of automobile loan payments was sufficient to meet one year of premiums on Life Settlements Credit Nation held. (Id. ¶ 45).

---

offer and sale of promissory notes and LS Interests. The Court determines the Complaint sufficiently alleges the interstate commerce element.

[19]  The SEC alleges the "Offering Defendants" made misrepresentations and omissions. The Offering Defendants are Mr. Torchia, CN Capital, and CN Acceptance. For the sake of simplicity, the Court refers to the Offering Defendants simply as "Defendants" or "Credit Nation."

- CN Capital "expect[ed]" that its Life Settlements would generally yield about 15% per annum. (Id. ¶ 44).

- Credit Nation's investments are fully secured by assets, and Credit Nation is profitable. (Id. ¶¶ 71-73, 76, 83).

- Credit Nation failed to disclose its "multi-million dollar per year operating losses" and "massive insolvency." (Id. ¶¶ 3, 77-81).

- Neither CN Capital nor the promissory notes it offers are disclosed to those who purchase LS Interests through CN Acceptance. (Id. ¶ 56).

- Credit Nation failed to disclose its obligation to repay startup loans from Torchia and related entities. (Id. ¶ 112).

Defendants argue that the SEC's claims fail to identify when, where, and to whom the alleged misstatements or omissions were made, and thus fail to meet the heightened pleading requirements of Rule 9(b). ([21.1] at 17).

The Eleventh Circuit has stated:

Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

Dixon v. Allergan USA, Inc., —— F. App'x ——, ——, 2016 WL 946553, at *2 (11th Cir. Mar. 14, 2015) (quoting Tello v. Dean Witter Reynolds, Inc., 494 F.3d 956, 972 (11th Cir. 2007)).

Defendants' suggestion that the SEC failed to identify when, where, and to whom the alleged misstatements or omissions were made is, at least, disingenuous. In addition to the allegations listed above, the Complaint also alleges a variety of fact-specific allegations of fraud:

- CN Capital's "2013 offering memorandum, which was used from September 2013 through November 2014," (Compl. ¶ 40), "expects the pool of Life Settlements will generally yield about 15% per annum," (id. ¶ 44).

- "The November 2014 Offering Memorandum, which is still in use, contains similar statements[.]" (Id. ¶ 41).

- "Credit Nation's newspaper advertisements, which have appeared in Georgia, South Carolina, Texas and California, generally state, among other things, that the investment: (i) generates a 9% fixed return with interest paid quarterly; (ii) is 100% asset backed . . . ." (Id. ¶ 46).

- Radio advertisements have been broadcast in Texas, Georgia, and South Carolina, (id. ¶ 47), the specific text of which advertised a 9% return on investment and that assets are backed dollar for dollar, (id. ¶¶ 48-49).

- A 78 year old retiree and resident of South Carolina ("Investor A") invested $50,000 in promissory notes and $50,000 in LS Interests after seeing a Credit Nation advertisement in his local newspaper in late 2013. (Id. ¶¶ 66-67).

- In early September 2015, Credit Nation produced to the SEC non-GAAP financial reports which "confirm that the representations made by the company regarding the safety of the investments and the profitability of its investment strategy are false." (Id. ¶¶ 74-76). The report showed the notes are not "100% asset backed" or "backed by hard assets dollar for dollar" because "the company's liabilities dwarf its assets and the company has sustained multi-million dollar per year operating losses." (Id. ¶ 77).

These allegations are merely a subset of the detailed allegations in the
Complaint.[20] The Court finds that the SEC's factual allegations, with respect to its
fraud claims under Section 10(b) and Rule 10b-5, satisfy the particularity pleading
requirements of Rule 9(b).

Defendants next argue that, in alleging that Defendants' representations and
omissions were misleading, "the SEC misconstrues the financial information
[Defendants] provided in connection with the SEC's two-year investigation."
([21.1] at 17). They contend that the SEC inappropriately relies on a cost basis
analysis of Credit Nation's finances to allege that Credit Nation's liabilities exceed
its assets, that Credit nation does not use cost basis to value its Life Settlements,
that the SEC ignores GAAP accounting principles, and that the SEC ignores key
disclosures in the offering memoranda. (Id. at 17-19).

On a motion to dismiss pursuant to Rule 12(b)(6), the Court must "assume
that the factual allegations in the complaint are true and give the plaintiff[] the
benefit of reasonable factual inferences." Wooten, 626 F.3d at 1196. The
Complaint plausibly alleges that Credit Nation's assets are substantially
outweighed by its liabilities, (see, e.g., Compl. ¶¶ 3, 76-83), and the Court must

---

[20]    The SEC points out that the offering memoranda and LS Interest sales
packets were produced by Credit Nation to the SEC and given to each investor, and
Credit Nation thus had ample "fair notice" of the SEC's claims. ([25] at 21).

assume these allegations are true.[21]  Defendants also urge the Court to consider

their argument that the Financial Packets referenced in the Complaint do not show

that Credit Nation is insolvent.  That the Court conducted a TRO hearing and a

two-day preliminary injunction hearing addressing, in large part, whether the

Financial Packets show Credit Nation is insolvent undermines Defendants'

litigation position that the Complaint and Financial Packets, on their face, do not

show that Credit Nation is insolvent.  Defendants' arguments that the Complaint

relies on "misconstrue[d]" evidence are appropriate arguments in opposition to the

SEC's Preliminary Injunction Motion, and their arguments are addressed below in

the Court's consideration of that motion.  These arguments are not, however, a

---

[21]      In their Motion to Dismiss, Defendants point to disclosures in their offering
memoranda warning investors of the possibility of Credit Nation operating at a loss
and its liabilities exceeding its assets. ([21.1] at 19).  Taking as true the
Complaint's allegations that the offering memoranda were distributed while Credit
Nation actually operated at a loss and while its liabilities exceeded its assets, the
offering documents' generic cautionary language was affirmatively deceptive,
because the language implied that the risks cautioned against had not occurred,
when they had. See Merchant Capital, 483 F.3d at 769 ("[T]o warn that the
untoward may occur when the event is contingent is prudent, to caution that it is
only possible for the unfavorable events to happen when they have already
occurred is deceit.").

basis for the Court to dismiss the SEC's claims.[22] Defendants' Motion to Dismiss

is denied.

## III.   THE SEC'S PRELIMINARY INJUNCTION MOTION

The Court now addresses the SEC's motion for injunctive relief. In its

Preliminary Injunction Motion, the SEC seeks a preliminary injunction, a freeze of

Defendants' assets, and the appointment of a receiver. The Court first addresses

whether the SEC has met its burden to support the preliminary injunction sought.

---

[22]      Defendants also argue that Mr. Torchia and Credit Nation did not
commingle funds or misappropriate investor money, and that Credit Nation is not a
Ponzi scheme. It is not clear which elements of a violation of Section 17, Section
10(b), or Rule 10b-5 Defendants seek to undermine with these arguments. The
SEC is not required to allege that Credit Nation meets some specific definition of a
Ponzi scheme for it adequately to allege securities violations. The allegations in
the Complaint regarding Mr. Torchia's misappropriation of investor money
support the SEC's fraud claims, and, as a result, the SEC alleges sufficient facts to
sustain claims of fraud under the Securities Act and the Exchange Act. The Court
finds that the SEC's allegations that Mr. Torchia and Credit Nation
misappropriated investor money are sufficiently well-pled. A sample of the SEC's
specific allegations of misappropriation includes: Mr. Torchia gave undocumented
"loans" to Credit Nation, for which transfers to himself and his other business are
purportedly repayment; these purported loans were not disclosed to investors;
Spaghetti Junction and CN Capital transferred hundreds of thousands of dollars to
Sixes Tavern; and Mr. Torchia transferred $195,842 of CN Capital funds to
Willie's West, LLC, which used the funds to purchase a residential home in
Canton, Georgia in which Mr. Torchia lives. (Compl. ¶¶ 100, 104, 110, 112).

A.     Preliminary Injunction

The Securities Act provides:

> Whenever it shall appear to the Commission that any person is
> engaged or about to engage in any acts or practices that constitute or
> will constitute a violation of the provisions of this subchapter, or of
> any rule or regulation prescribed under authority thereof, the
> Commission may, in its discretion, bring an action in any district court
> of the United States, . . . to enjoin such acts or practices, and upon a
> proper showing, a permanent or temporary injunction or restraining
> order shall be granted without bond . . . .

15 U.S.C. § 77t(b).  The Exchange Act contains a similar provision authorizing

injunctive relief.  See 15 U.S.C. § 78u(d)(1).

In this Circuit, the "SEC is entitled to a preliminary injunction when it

establishes . . . (1) a prima facie case of previous violations of federal securities

laws, and (2) a reasonable likelihood that the wrong will be repeated."  Unique Fin.

Concepts, 196 F.3d at 1199 n.2; see also Calvo, 378 F.3d at 1216 (applying same

standard on review of a permanent injunction).  In determining the probability that

a party will again engage in violations of the securities laws, a court should

consider the "egregiousness of the defendant's actions, the isolated or recurrent

nature of the infraction, the degree of scienter involved, the sincerity of the

defendant's assurances against future violations, the defendant's recognition of the

wrongful nature of the conduct, and the likelihood that the defendant's occupation

will present opportunities for future violations." Id. (quoting SEC v. Carriba, 681 F.2d 1318, 1322 (11th Cir. 1982)).

In considering the SEC's Preliminary Injunction Motion, the Court understands that the federal securities laws are to be interpreted broadly and liberally to effectuate Congress's intent to protect investors and to reach the various schemes devised by those persons who would use the money of others on the promise of profits. See Carriba, 681 F.2d at 1324.

In this case, Defendants admit that the promissory notes sold by CN Capital are securities, ([48.1] at 3), and the Court has found that the LS Interests also are securities. The evidence in the record and the testimony and evidence presented during the preliminary injunction hearing further support the Court's conclusion that the LS interests are securities.[23] The Court next considers whether the SEC established a prima facie case that Defendants violated the securities laws.

---

[23]   For instance, the record shows that CN Acceptance performed services for investors such as monitoring the insured's status, obtaining annual statements from insurance companies, and applying for death benefits. ([2.15] at CN-SEC-000569, -576). Mr. Torchia testified that Credit Nation hired doctors to analyze life expectancy. (Tr. at 214:8-14).

1.    Prima Facie Case of Securities Violations

The SEC alleges that Defendants violated Sections 5(a) and 5(c) of the

Securities Act and the Anti-Fraud Provisions of the Securities Act and the

Exchange Act.

a)    Section 5 of the Securities Act

"In order to establish a prima facie case for a violation of § 5 of the

Securities Act, the SEC must demonstrate that (1) the defendant directly or

indirectly sold or offered to sell securities; (2) through the use of interstate

transportation or communication and the mails; (3) when no registration statement

was in effect." Big Apple, 783 F.3d at 806-807. "Once participation in an

unregistered sale has been shown, the [sellers] have the burden of proving an

exemption to the registration requirements." Id. at 807.

Defendants admit that (1) the promissory notes sold by CN Capital are

securities; (2) they were sold using the instrumentalities of interstate commerce;

and (3) no registration statement was in effect with the SEC as to those promissory

notes. ([48.1] at 3-4).  It is thus Defendants' burden to prove an exemption to the

registration requirements.

Defendants argue that the SEC "fails to show that Credit Nation did not take

reasonable steps to verify investors' accredited statuses." ([26] at 5).  Defendants

46

also reiterate the argument they made in support of their Motion to Dismiss that

"an investor's ability to satisfy a sizeable minimum investment *can* be an

indication of accredited status." (Id. (emphasis added)).  While interesting

observations, they ignore that the burden is on Defendants to prove an exemption

to the registration requirements.[24]  They also side step Defendants' failure to offer

any evidence, or argument, to support that their sales of promissory notes were

exempt from the registration requirements.  That they have raised the *possibility*

that the promissory notes were exempt is not enough.  There is an absence of

evidence to support even an inference that a registration exemption applies.  There

is nothing in the record to show that Defendants made any effort to determine if

investors were accredited or otherwise have the financial acumen or resources to

evaluate and understand the value or risk of the investments Defendants were

touting as providing 9% annual returns.  Because the SEC has demonstrated that

Defendants sold securities through the use of interstate communication when no

registration statement was in effect, and because Defendants have not met their

burden to prove an exemption to the registration requirements, the Court

---

[24]     Defendants' citations to SEC regulations that might provide exemptions
from the registration requirements, (see [26] at 5), is not enough to meet their
burden of proof.  Defendants do not offer any evidence in support of their
argument that the regulations cited apply to the promissory notes.

necessarily finds that the SEC has established a prima facie case that Defendants

violated Section 5 of the Securities Act.[25]  See Big Apple, 783 F.3d at 806-807.

      b)     The Anti-Fraud Provisions

The SEC also alleges that Defendants violated Sections 17(a)(1), 17(a)(2),

and 17(a)(3) of the Securities Act, Section 10(b) of the Exchange Act, and SEC

Rule 10b-5—known as the Anti-Fraud Provisions.  To establish prima facie

violations of Section 17(a)(1), Section 10(b), and Rule 10b-5, the SEC must

demonstrate that Defendants made "(1) material misrepresentations or materially

misleading omissions, (2) in connection with the purchase or sale of securities,"

and that they "(3) made [them] with scienter."  See Merchant Capital, 483 F.3d at

766 & n.17.  To establish that Defendants violated Sections 17(a)(2) and 17(a)(3),

"the SEC need only show (1) material misrepresentations or materially misleading

omissions, (2) in the offer or sale of securities, (3) made with negligence."[26]  Id.

---

[25]    Based on the evidence presented, it is questionable whether Defendants will be able to prove that an exemption applies.

[26]    All of these violations also require proof of an interstate commerce or mails element.  See 15 U.S.C. § 78j(b); 15 U.S.C. § 77q(a).  Defendants admit, ([48.1] at 4-5), that CN Capital and CN Acceptance used instrumentalities of interstate commerce in connection with the offer and sale of promissory notes and LS Interests.  The SEC thus has proved this element for purposes of its prima facie case.

"[I]n SEC civil enforcement actions for preliminary injunctive relief under the antifraud provisions of the federal securities laws . . . the proper standard of proof is the preponderance of the evidence." SEC v. First Fin. Grp. of Tex., 645 F.2d 429, 434 (5th Cir. Unit A May 1981) (citations omitted).

Having determined that the promissory notes and LS Interests sold by Defendants are securities, the Court determines that the second element of each test is met. The Court now considers whether (1) Defendants made material misrepresentations or materially misleading omissions (2) with scienter.

### (1)    Material Misrepresentations or Omissions

"The test for materiality in the securities fraud context is 'whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action.'" Merchant Capital, 483 F.3d at 765 (citing Carriba, 681 F.2d at 1323). The SEC shows that Defendants advertised to investors that promissory notes offered to them for sale would yield a "9% fixed return APR" and were "100% asset backed" or "backed by hard assets." (See, e.g., [2.9], [2.10]). Defendants admit that:  (1) CN Capital has reported losses to the IRS for each year since at least 2011; (2) CN Capital's investments in sub-prime automobile loans were not profitable in 2014 or in the first six months of 2015; and (3) CN Capital told investors that "the expenses of operating the Company and

49

investment losses *could* exceed the Company's income[,]" ([48.1] (emphasis

added)), but did not disclose that they already had.

At the hearing, Ms. Hartman, the forensic accountant hired by Defendants to

respond to the SEC's investigation, testified at length regarding her analysis of

Credit Nation's finances. Ms. Hartman was eminently qualified to perform the

forensic analysis about which she testified, and was well-qualified to explain the

opinions and conclusions she offered. Her testimony was articulate, supported by

uncontested facts, direct, and helpful. She was a compelling, credible witness.

Ms. Hartman testified that Credit Nation was operating at a loss in 2014 and

2015. (Tr. at 125:21-25). The company was not profitable. (Id. at 126:6). Based

on her analysis of Credit Nation's profits and losses from 2014 to 2015, the losses

were accelerating. (Id. at 126:8-15). She testified that her analysis showed that

Credit Nation's liabilities greatly exceeded its assets. (See id. at 79:13-21,

94:10-25, 98:1-22; Pl.'s Ex. 1 at 15).

Defendants admit they cannot identify any inaccuracies in Ms. Hartman's

analysis of Credit Nation's financial condition in 2014 and the first six months of

2015. ([48.1] at 5-6). They argue, however, that the SEC fails to show Defendants

made material misrepresentations or omissions because (1) the SEC incorrectly

values Credit Nation's life insurance policies; (2) Ms. Hartman's Financial

Snapshots are not GAAP compliant and thus understate its assets; and (3) Credit

Nation fully disclosed the possibility of operating losses to investors and explained

that its liabilities could exceed its assets. ([26] at 6-11).

Defendants argue that the SEC incorrectly values Defendants' life insurance

policies. At the end of 2014, Defendants owned policies with a maturity value of

approximately $13 million. (Pl.'s Ex. 2 at 31). After December 31, 2014,

Defendants spent approximately $6 million to purchase new policies, (Pl.'s Ex. 1 at

1 (purchases of policies from third parties for $5,074,500 and purchase of a policy

from an affiliate for $1,196,549)), which have a maturity value of $75 million, (id.

at 13). Defendants thus claim that the total market value of their life settlements

"is at least $40 million," (see, e.g., [19] at 4), which shows that Defendants are

solvent.

In support of this claim, Defendants rely solely on Mr. Torchia's testimony

that he could sell Credit Nation's settlement policies "in under three months for at

least [$]35 million." (Tr. at 219:3-13). Mr. Torchia's testimony was not credible.

The "opinions" he offered were not supported by facts and were based on broad,

speculative generalizations. His conclusory statements were not persuasive and the

Court believed many of them to be untrue. Mr. Torchia struggled to provide a

coherent explanation of his process to determine the purchase price for life

insurance policies, and his testimony was evasive. When confronted with

Mr. Freeman's analysis of the total premiums Credit Nation was required to pay on

the Kahan policy and that the premiums exceeded the death benefits Credit Nation

expected, he testified, without any factual or logical support, that he "inherited

along with that [Kahan] portfolio . . . 14 million dollars' worth of death benefits on

top of it for free on people that were older." (Tr. at 251:24-252:2). Mr. Torchia

did not explain the source of the purportedly "free" $14 million in additional death

benefits, and the Court discredits the assertions as untrue. (Id. at 252:3-254:2).

Defendants do not identify, and the Court is unable to find, any support in the

record for Mr. Torchia's far-fetched assertions. Confronted with a projected loss

on the Sneider policy, he claimed, equally unconvincingly, that "we inherited 24

million dollars in death benefits for free. Just pay the premiums." [27] (Id. at

---

[27]     In their post-hearing reply brief [63], Defendants attempt to show that their
Sneider policy transactions were profitable. Defendants provide a declaration by
Ms. Hardie [63.1] which purports to show that, after taking into account the
purchase price, estimated premiums, sale revenue, maturity value, and maturity
owed to third parties, the net profit to Credit Nation is approximately $11.4
million. (See [63] at 2). Ms. Hardie did not offer testimony about the Sneider
transaction at the preliminary injunction hearing to explain Mr. Torchia's
testimony about the "free" death benefits included in the transaction. In her
attempt to explain the transaction weeks later, and without being subject to
cross-examination, Ms. Hardie still does not provide specific information to
explain the "free" value about which Mr. Torchia testified and appears only to

258:24-259:3).  The Court found wholly unpersuasive Mr. Torchia's effort to prop

up Credit Nation's finances.

The Court finds Defendants' valuations of their life insurance policies are, at

best, unsubstantiated, and, at worst, deliberately misleading.  Mr. Freeman, the

SEC's life settlement valuation expert,[28] testified that the ten policies that make up

the majority of the death benefits owned by Credit Nation have a total fair market

value between $1.5 million and $2.2 million.  (Tr. at 164:12-22; Pl.'s Ex. 20).

Ms. Hartman's analysis of Credit Nation's own accounting records shows that the

total value, on a cost basis, of life settlements owned by Credit Nation was

approximately $9 million.  ([2.5] at 15).  These figures are credible both because

Mr. Freeman and Ms. Hartman provided detailed, thorough analyses, and because

the values are reasonably related to the price Credit Nation paid for the policies it

purchased in 2015—$6 million—and to the face value of the policies owned at the

end of 2014—$13 million.

Defendants, on the other hand, did not offer any evidence to support their

unsubstantiated claim that they could, today, sell for $40 million the policies they

---

provide information about the financial results they hope to achieve.  Defendants
do not attempt at all to show that their Kahan policy transactions were profitable.
[28]    The Court found Mr. Freeman to be well-qualified to offer the testimony he
gave.  His opinions were well-supported and reliable.

purchased a year ago for $6 million and policies they purchased previously—

policies that, in the aggregate, had only $13 million in maturity value at the end of

2014.[29] According to Defendants, a company that has liabilities exceeding its

assets can purchase life insurance policies for a few million dollars that would,

practically overnight, inflate its assets by tens of millions of dollars because the

policies at some point would realize their face value when the insured died.

Extraordinary "wishing it were so" claims like these require evidence to support

them, which is not in the record here. Their theory appears to be that the moment

an insurance policy is purchased, its value is its face value minus the premiums it

expects to pay until the insured dies. Put another way, if a policy with a face value

of $1 million is purchased for $600,000, its value is $1 million minus estimated

premiums required to be paid to keep the policy in force. They reject that the value

is what they paid for the policy or what a willing purchaser would pay for the

policy in an arm's length purchase.[30] This valuation assumption is illogical and

---

[29]      Defendants' policy face value valuation claim is illogical and inconsistent
with the evaluations performed by Ms. Hartman and Mr. Freeman. The value of an
asset is the fair market value, not what it may produce at some uncertain future
date after the continuous payment of premiums. Defendants' valuation method
may be persuasive when advertised to investors. It is not persuasive to the Court.
[30]      Defendants do not appear to account for an insured living longer than the life
expectancy they estimate, the failure of the insurer, the company's overhead, the

inconsistent with commercial reality.[31, 32]

Defendants also point to the following language in CN Capital's offering

memoranda to support the claimed truthfulness of its representations to investors:

> [T]he Company will determine the value of each Life Settlement
> in its sole discretion, based on accepted industry standards . . . . For
> purposes of valuing the Life Settlements, the Company may rely in
> whole or in part upon, among other things, verbal or written
> statements produced by generally accepted industry valuation
> techniques, industry experts or unaffiliated third parties, and/or its
> own estimates.

---

general uncertainty in the market, fraud in the application for the insurance policy,
or other factors. Mr. Torchia's view is that it will all work out over time.

[31]    For these same reasons, the Court does not credit Defendants' argument
that the "dramatic[]" increase in the maturity value of Credit Nation's assets since
the end of 2014 is "an indication that [Credit Nation]'s financial picture is
continuing to improve and that [Credit Nation] is not 'failing.'" ([61] at 5).  If
Defendants' valuation method was sound there would have been no need to
purchase additional policies to prop up the value of Defendants' assets by simply
increasing the aggregate face value of policies held.

[32]    The Court notes that the total maturity value of the policies owned by Credit
Nation at the end of 2014 was approximately $13 million, and that Credit Nation's
liabilities were approximately $30 million.  That the maturity value and fair market
value of policies owned by Credit Nation may have increased in 2015 does not
bear on the securities sold during 2014.  Even if, for every life insurance policy
owned by Credit Nation at the end of 2014, every insured had died on
January 1, 2015, Credit Nation would have received $13.3 million in death
benefits—not nearly enough to repay the $29 million it owed to investors, even if
Credit Nation's other assets were included.  (See Tr. at 80:11-17; Pl.'s Ex. 1; Pl.'s
Ex. 2).  This evidence alone is sufficient to show that, in 2014, the offering
memoranda and advertisements contained material misstatements and omissions.

(2013 Offering Memorandum at 23; 2014 Offering Memorandum at 23 (emphasis

added)). Ms. Hartman, Defendants' forensic accounting analyst, valued the Life

Settlements at their investment basis and determined that the policies are worth

approximately $9 million, which, together with Credit Nation's $6 million in other

assets, is disturbingly short of the amount required to cover Credit Nation's

approximately $42 million in liabilities. ([2.5] at 15).[33] Defendants do not offer

any accepted industry standards they ever used to conduct valuations, and do not

offer any evidence of statements produced by generally accepted industry

valuation techniques, experts or other credible industry parties or methods upon

which they relied in valuing their life settlements.  Defendants do not even offer

credible estimates they made, choosing to rely on Mr. Torchia's back-of-the-

napkin "valuation" decisions.  There certainly is no evidence that Mr. Torchia's

valuations were accepted within his industry.  Simply stated, the only evidence

---

[33]     The Court also does not credit Defendants' characterization of their business
as one that is "in the early years" and as one that is analogous to "a medical device
research and development company." ([26] at 8). Defendants also argue that
"Credit Nation considers [losses] part of the[ir business] model." ([61] at 5).
Credit Nation has been raising money since 2009, and Defendants do not appear to
contest that their investment strategy has never been profitable.  Moreover,
Defendants did not disclose or market their investments as speculative—instead,
they told investors that their investments would be backed by hard assets dollar for
dollar.

offered by Defendants was Mr. Torchia's unsubstantiated testimony that he could sell the policies for at least $35 million.

To try to shore up their financial status, Defendants next argue that their own forensic accountant's analysis of Credit Nation's finances is wrong. Defendants contend that Ms. Hartman's Financial Snapshots are "preliminary, subject to revision, and based on a review of cash flow . . . ." ([26] at 9). They argue that the Financial Snapshots are non-GAAP, which understates the value of Defendants' assets. (Id. at 9-10).

Defendants ignore that Ms. Hartman's analysis is not GAAP compliant largely because Defendants' records were kept by untrained, uncertified employees and thus the records were not even capable of allowing a GAAP analysis. (See Tr. at 13:19-22, 14:5-20). Defendants nevertheless argue—without factual or legal support—that, under GAAP, premiums paid on the Credit Nation's life settlements would not be booked as an expense. Defendants also ignore Ms. Hartman's testimony that her non-GAAP accounting operated in Defendants' favor, and not its detriment. Ms. Hartman testified that a GAAP compliant balance sheet would record "unearned revenue" for policies that Credit Nation sold to investors in the past. (Id. at 67:4-23, 75:10-25, 95:14-25). Unearned revenue is a liability that accounts for the fact that Credit Nation promised to pay premiums on behalf of

investors to whom it sold policies.  (See id. at 67:6-23).  The conclusion the Court

reaches here, considering all of the evidence available to it, including that

presented at the evidentiary hearing, is that Ms. Hartman's analysis properly

presents sufficient evidence of Defendants' finances based on Defendants' own

bank statements and internal accounting records.  Ms. Hartman's Financial

Snapshots are a credible, accurate presentation of Defendants' finances, and are

reliable.

Based on Ms. Hartman's testimony and her Financial Snapshots,

Mr. Freeman's testimony, and the entirety of the evidence in the record, the Court

finds that, during the period alleged by the SEC, Defendants' liabilities exceeded

its assets by a material amount.  Without disclosing these important financial facts,

Defendants made material misstatements when they told investors that the

promissory notes were "100% asset backed" and "backed by hard assets dollar for

dollar."  Defendants made material omissions when they failed to disclose their

losses and true financial circumstances to investors.

The Court also finds Credit Nation's generic risk disclosures are insufficient

to make these misstatements and omissions immaterial.  Defendants claim the

following language in their offering memoranda is sufficient to make its

disclosures not misleading:

> **Operating Deficits.** The expenses of operating the Company and investment losses could exceed the Company's income, which **could result in the Company's aggregate liability under the Notes exceeding the value of its assets**. If that occurs, the Company has the right to repay Noteholders less than the principal amount of their Notes.

(2013 Offering Memorandum [21.4] at 19 (ECF Pagination); 2014 Offering Memorandum [21.5] at 19 (ECF Pagination) (emphasis added)).

Defendants necessarily admit that, when these disclosures were made, CN Capital had reported losses to the IRS each year since at least 2011. (See [48.1]). Ms. Hartman's largely uncontroverted testimony further supports that Credit Nation has been unprofitable for years and that its liabilities exceeded its assets. Defendants' generic disclosures that the company "could" experience losses or that its liabilities may exceed its assets did not save Defendants' misrepresentations, and they otherwise were affirmatively, materially misleading. As the Eleventh Circuit stated in Merchant Capital, "[t]o warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." 483 F.3d at 747. Here, the SEC presents ample evidence that the unfavorable events—losses and liabilities that exceed assets—had already occurred when Defendants made their disclosures, which made those disclosures materially misleading. Further, these misstatements and omissions were material because "a

59

reasonable man would attach importance" to them. See id. at 765. Reasonable

investors, aware of the truth of the information represented to them and the status

of Defendants' financial health withheld from them, would have been hesitant to

make the investment offered.

The SEC has met its burden to satisfy the first two elements required to

establish a prima facie case of a violation of the Anti-Fraud Provisions of the

securities laws. The Court now addresses the final element of scienter.[34]

### (2)  Scienter

As the Eleventh Circuit explains:

> Scienter may be established by a showing of knowing misconduct or
> severe recklessness. Proof of recklessness requires a showing that the
> defendant's conduct was an extreme departure of the standards of
> ordinary care, which presents a danger of misleading buyers or sellers
> that is either known to the defendant or is so obvious that the actor
> must have been aware of it.

SEC v. Monterosso, 756 F.3d 1326, 1335 (11th Cir. 2014) (alterations omitted)

(quoting Carriba, 681 F.2d at 1324). Scienter can be established through

circumstantial or direct evidence. Id. (citing SEC v. Ginsburg, 362 F.3d 1292,

1298 (11th Cir. 2004)).

---

[34]  To show that Defendants violated Sections 17(a)(2) and 17(a)(3), the SEC
need only show negligence, rather than scienter. Merchant Capital, 483 F.3d at
766.

The evidence here shows that Defendants were, at the very least, severely reckless in offering the promissory notes for sale to investors. Defendants admit CN Capital had reported losses to the IRS each year since at least 2011, ([48.1]), but failed to inform investors of their poor financial health, choosing to instead state that Credit Nation *could* incur losses rather than had actually incurred significant losses by the time the representations were made to investors. Mr. Torchia testified that Credit Nation reported losses in 2011, 2012, and 2013. (Tr. at 271:2-8). He testified that Defendants "told [investors] we *could* run at a loss. And I don't think it's my duty to tell [investors] that we *are* running at a loss." (Id. at 277:23-278:3 (emphasis added)). This evidence alone is sufficient to support a finding of scienter.[35] It certainly is evidence of Mr. Torchia's and Defendants' belief they were not obligated to be truthful about their financial status.

Beyond operating losses, at the end of 2014, Credit Nation had approximately $32 million in liabilities and assets consisting only of about $2.8 million in outstanding principal on auto loans, life settlements with a maturity value of approximately $13.3 million, and about $1 million in cash. It is incredible

---

[35]    Ms. Hartman testified that the individuals responsible for accounting at Credit Nation "were not trained accountants," and that this was unusual for a company the size of Credit Nation, (see Tr. at 13:19-22, 14:5-20), supporting that Defendants' practices at least deviated from the standards of ordinary care.

that a company faced with such a financial condition—even if the details were

unclear—was oblivious to it. The Court finds that Credit Nation's financial

situation was "so obvious that [Mr. Torchia and Defendants] must have been aware

of it." Monterosso, 756 F.3d at 1335. Indeed, the Court finds that Mr. Torchia

knew of Defendants' precarious financial status, that it was trending worse, and

chose not to disclose it.

Credit Nation's 2015 purchase of $6 million in life insurance policies further

supports that Mr. Torchia acted with scienter. Faced with an SEC investigation,

Credit Nation purchased $6 million in life insurance policies, and Mr. Torchia and

Defendants now claim—despite all evidence to the contrary—that the market value

of those policies is $35 to $40 million, rendering Credit Nation solvent. This sort

of arbitrary valuation sleight of hand, offered by a CEO whose testimony was not

credible, shows an "extreme departure from the standards of ordinary care" that

presented so obvious a danger of misleading buyers that Mr. Torchia "must have

been aware" of the risk. See SEC v. Imperiali, Inc., 594 F. App'x 957, 961 (11th

Cir. 2014) (quoting Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir.

2001)). Further, the circumstances surrounding Credit Nation's purchase of the

policies, and their arbitrarily-inflated valuation of them, supports the reasonable

inference that Credit Nation purchased the policies to inflate artificially its assets

on its balance sheet. This inference further supports the Court's determination that

Mr. Torchia acted with scienter.[36] Because Mr. Torchia controls the other

Defendants, his scienter is imputed to them. SEC v. Manor Nursing Ctrs., Inc.,

458 F.2d 1082, 1089 n.3, 1096 n.16 (2d Cir. 1972).

The Court finds that the SEC has shown, by a preponderance of the

evidence, that Defendants violated the Anti-Fraud Provisions.

>       2.      Likelihood the Wrong Will Be Repeated

Having established their prima facie case of securities violations, the SEC

must establish a reasonable likelihood that the wrong will be repeated. Indicia that

a wrong will be repeated include: (1) the egregious nature of Defendants' actions;

(2) the isolated or recurrent nature of the violations; (3) the degree of scienter

involved; (4) the sincerity of Defendants' assurances; (5) Defendants' recognition

of the wrongful nature of their conduct; and (6) the likelihood that Defendants'

present occupations will present opportunities for future violations. Salvo,

378 F.3d at 1216 (quoting Carriba, 681 F.2d at 1322).

---

[36]     Even if the Court had not found Defendants acted with scienter, the SEC met
its lesser burden to show, for purposes of Sections 17(a)(2) and 17(a)(3), that
Defendants acted with "negligence." See Merchant Capital, 483 F.3d at 766.
Violations of Sections 17(a)(2) and 17(a)(3) also support the issuance of the
injunction the Court orders in this case.

Defendants argue that a preliminary injunction should not be issued, including because they "already agreed to discontinue the sale of 9% promissory notes pending resolution of the SEC's" Preliminary Injunction Motion, they are currently "revising [their] offering documents," and they "asked [their] forensic accountant to provide recommendations for improving [their] accounting processes . . . ." ([26] at 15-16). This is too little, too late.

The Court finds the SEC has shown a reasonable likelihood of future violations. Defendants' conduct, in light of their financial situation, is egregious: Defendants have repeatedly sold and solicited "100% asset backed" promissory notes with a "9% fixed return" knowing—or at least recklessly disregarding—that Credit Nation was unprofitable and that its financial situation was deteriorating. Despite their assurances that they are revising their offering documents, Defendants have not presented any assurances that they will not continue to violate federal securities laws now or in the future. Defendants also have not recognized the wrongful nature of their acts, maintaining that their finances and their business model are sound. Defendants' present occupations—selling Sub-Prime Auto Loans and LS Interests—clearly present opportunities for future violations. Credit Nation continues to seek to sell promissory notes and LS interests, claiming that its financial management is responsible and its financial condition enviable, and that

the SEC simply misunderstands its business model. The core facts are, however, that Credit Nation has operated at a loss for years, its liabilities substantially exceed its assets, and its financial situation is deteriorating. Defendants' continuing financial and management issues support a reasonable likelihood of future securities violations. To the extent Mr. Torchia claims he is seeking to reform his companies' operations to comply with SEC requirements, the Court does not believe him. Rather his "fight it to the death" approach to business and court obligations, (Tr. at 273:9-10), supports that reform is not reasonable to expect.

The SEC has established a prima facie case of previous violations of federal securities laws, as well as a reasonable likelihood that the wrong will be repeated. The SEC has thus satisfied both requirements for a preliminary injunction pending the outcome of this litigation.[37] See Unique Fin. Concepts, 196 F.3d at 1199 n.2. Having determined that the SEC has met its burden to show that a preliminary injunction is warranted, the Court addresses whether an asset freeze should be imposed and a receiver appointed.

---

[37]  The Court notes, however, that additional discovery will be taken in this matter and that neither party should infer from this preliminary decision that the Court's findings and rulings will be unaffected by a full trial on the merits of this action. SEC v. Shiner, 268 F. Supp. 2d 1333, 1343 (S.D. Fla. 2003).

B.    <u>Receiver</u>

In <u>First Fin. Grp.</u>, the former Fifth Circuit Court of Appeals, in a case that is

binding precedent here, set out the considerations for the appointment of a receiver

in SEC enforcement actions:

> The appointment of a receiver is a well-established equitable
> remedy available to the SEC in its civil enforcement proceedings for
> injunctive relief. The district court's exercise of its equity power in
> this respect is particularly necessary in instances in which the
> corporate defendant, through its management, has defrauded members
> of the investing public; in such cases, it is likely that, in the absence of
> the appointment of a receiver to maintain the status quo, the corporate
> assets will be subject to diversion and waste to the detriment of those
> who were induced to invest in the corporate scheme and for whose
> benefit, in some measure, the SEC injunctive action was brought. As
> the Seventh Circuit stated in <u>Securities and Exchange Commission
> v. Keller Corporation</u>, 323 F.2d 397, 403 (7th Cir. 1963):
>
> > The prima facie showing of fraud and mismanagement,
> > absent insolvency, is enough to call into play the
> > equitable powers of the court. It is hardly conceivable
> > that the trial court should have permitted those who were
> > enjoined from fraudulent misconduct to continue in
> > control of (the corporate defendant's) affairs for the
> > benefit of those shown to have been defrauded. In such
> > cases the appointment of a trustee-receiver becomes a
> > necessary implementation of injunctive relief.
>
> Thus, the appointment of a temporary receiver is often a
> necessary ancillary form of relief in a SEC civil enforcement action
> for injunctive relief. And it was for this purpose to insure complete
> enforcement of the federal securities laws that the appointment of a
> temporary receiver was requested by the SEC and granted by the
> district court in the instant case.

645 F.2d at 438 (citations omitted).[38]

     The Court determines that the evidence presented to it proves that Credit Nation's management, and financial position, are not sound. The Court is unconvinced Credit Nation will act responsibly between now and trial. The evidence also shows that Credit Nation reported losses every year since at least 2011, and that, based on Ms. Hartman's analysis of Credit Nation's profits and losses from 2014 to 2015, its losses are accelerating, (Tr. at 126:8-15; see also Pl.'s Ex. 1; Pl.'s Ex. 2). Under these circumstances, "the appointment of a []receiver [is] a necessary implementation of injunctive relief." First Fin. Grp., 645 F.2d at 438 (citing Keller Corp., 323 F.2d at 403).[39]

     That Mr. Torchia and Credit Nation's employees appear to be, at the very

---

[38]    District courts have recently applied the standard articulated in First Fin. Grp. See, e.g., SEC v. Evolution Capital Advisors, LLC, 866 F. Supp. 2d 661, 668 (S.D. Tex. 2011) ("[U]pon a showing of fraud and mismanagement, appointment of a receiver becomes a necessary implementation of injunctive relief" (internal quotation marks omitted)); SEC v. AmeriFirst Funding, Inc., Civil Action No. 3:07-cv-1188-D, 2007 WL 2192632, at *3 (N.D. Tex. July 31, 2007).

[39]    Defendants argue that, in deciding whether a receiver should be appointed, the Court should consider the availability of less severe equitable remedies and the probability that a receiver may do more harm than good. ([26] at 14-15). Defendants do not provide any authority that, in the context of an SEC civil enforcement action, the Court should take these factors into consideration. The Court finds that, in any event, given Defendants' deteriorating financial situation, a receiver is required, less severe equitable remedies would not suffice, and a receiver would not do more harm than good.

least, severely reckless in their handling of their finances and the running of their business, further supports that a receiver is required. Mr. Torchia testified that he and his company are "the best in the world" at buying and selling insurance policies, but he showed little grasp of the process by which a life insurance policy is valued, or was unwilling to disclose it to the Court. His answers were evasive and general. For instance, he stated he buys certain policies "[b]ecause we feel that the life expectancies in certain areas are off," and that he is "looking for homeruns and . . . for potential." (Tr. at 214:3-20). He stated that he is "just not a very good accountant. We have outside CPAs that were brought in to set up the systems that were in place . . . . Accounting is not my strong suit." (Id. 223:25-224:6). Yet Ms. Hartman testified that the individuals responsible for accounting at Credit Nation "were not trained accountants," and that this was unusual for a company the size of Credit Nation. (See id. at 13:19-22, 14:5-20). Ms. Green, Mr. Torchia's own financial manager, could not explain the purpose of Mr. Torchia's nearly $3 million in loans to CN Auto from 2007 to 2013. (Id. at 315:18-316:20). The testimony presented at the preliminary injunction hearing and the evidence in the record shows numerous undocumented, unverified, or unexplained transactions between Mr. Torchia and other entities, supporting that Mr. Torchia and his staff are unable or unwilling to manage their finances. (See,

e.g., id. at 40:14-16 (CN Auto paid the payroll of both CN Auto and AMC); id. at

54:9-15 (money flow between Credit Nation and RiverGreen tracked on

spreadsheet by Mr. Torchia's employees); Pl.'s Ex. 2 at 39 (non-collectable loan to

CN Auto of $6.4 million at the end of 2014); Pl.'s Ex. 1 at 5-6 and Pl.'s Ex. 2 at

17-19 (Mr. Torchia directed the transfer of hundreds of thousands of dollars to CN

Auto, Spaghetti Junction, National Viatical, RiverGreen, Willie West, Jason's

Automotive, and Sixes Tavern); Tr. at 328:2-20 (no documentation memorializing

loans from Mr. Torchia or Credit Nation to Spaghetti Junction); id. at 304:24-305:5

(no loan agreements in place memorializing Mr. Torchia's loans to Credit Nation

and other entities)). These findings further support that a receiver is required in

this case.

C.    Asset Freeze

A district court may exercise its full range of equitable powers, including an

asset freeze, to preserve sufficient funds for the payment of a disgorgement award.

FTC v. U.S. Oil & Gas Corp., 748 F.2d 1431, 1433-34 (11th Cir. 1984); see also

Levi Strauss & Co. v. Sunrise Int'l Trading Co., 51 F.3d 982, 987 (11th Cir. 1995).

Freezing assets is a well accepted equitable remedy employed to "preserve the

status quo" and is proper in actions arising under the Securities Act. SEC v. ETS

Payphones, Inc., 408 F.3d 727, 734-35 (11th Cir. 2005) (citing United States

v. Oncology Assocs., 198 F.3d 489, 494-99 (4th Cir. 1999)); see also Levi Strauss, 51 F.3d at 987 (a request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze).

In light of Credit Nation's precarious financial situation and inability or unwillingness to manage its finances, the Court concludes an asset freeze is justified and appropriate to preserve the status quo and to preserve sufficient funds for the payment of any disgorgement award.[40] The Court notes that there already are in place certain restrictions on Defendants' business and use of assets pursuant to the November 20, 2015, and January 13, 2016, Consent Orders.

## IV.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss [21] is **DENIED**.

**IT IS FURTHER ORDERED** that the SEC's TRO Motion [2] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that the SEC's Preliminary Injunction Motion [20] is **GRANTED**. The specific terms of the injunction are as follows:

---

[40]   The SEC's TRO Motion seeks the same relief as its Preliminary Injunction Motion. Because the Court grants the SEC's Preliminary Injunction Motion, it denies as moot the SEC's TRO Motion.

## PRELIMINARY INJUNCTION ORDER

## I.   ENJOINING VIOLATIONS

**IT IS HEREBY ORDERED** that Defendants and their agents, servants,

employees, attorneys, and all persons in active concert or participation with them

are enjoined from violating, directly or indirectly:

A.    Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a),

   (b) and (c) promulgated thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)],

   by using any means or instrumentality of interstate commerce, or of the

   mails, or of any facility of any national securities exchange, in connection

   with the purchase or sale of any security:

   1.    to employ any device, scheme, or artifice to defraud, to make
         any untrue statement of a material fact or to omit to state a
         material fact necessary in order to make the statements made, in
         light of the circumstances under which they were made, not
         misleading, or

   2.    to engage in any act, practice, or course of business which
         operates or would operate as a fraud or deceit upon any person,
         by providing false or misleading information or omitting to
         provide material information to actual or prospective investors
         concerning the performance, return, existence, use or
         disposition of investor funds.

B.    Section 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2)

   and (3)] in the offer or sale of any security by the use of any means or

   instruments of transportation or communication in interstate commerce or by

use of the mails, directly or indirectly:

1.     to employ any device, scheme, or artifice to defraud;

2.     to obtain money or property by means of any untrue statement
       of a material fact or any omission to state a material fact
       necessary to make the statements made, in light of the
       circumstances under which they were made, not misleading, or

3.     to engage in any transaction, practice, or course of business
       which operates or would operate as a fraud or deceit upon the
       purchaser; by providing false or misleading information or
       omitting to provide material information to actual or
       prospective investors concerning the performance, return,
       existence, use or disposition of investor funds.

C.   Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), (c)] in the

offer or sale of any security by the use of any means or instruments of

transportation or communication in interstate commerce or by use of the

mails, directly or indirectly to offer to sell securities, through the use or

medium of any advertisement, placement memoranda or otherwise, without

a registration statement having been filed with the SEC as to such securities.

D.   Defendants are specifically enjoined from making the representations and

omissions identified in this Order or representations and omissions regarding

rates of return and Defendants' financial status in connection with the sale of

securities based on sub-prime auto loans, life insurance settlements, or the

sale of fractional interests in life settlement contracts.

## II.    PRESERVING RECORDS

**IT IS FURTHER ORDERED** that Defendants and their officers, directors,

agents, employees, servants, managers, general and limited partners, trustees,

employees, attorneys and accountants, any bank or financial institution holding any

assets of Defendants and all persons or entities in active concert or participation

with them, and each of them, are restrained and enjoined from destroying,

transferring or otherwise rendering illegible all books, records, papers, ledgers,

accounts, statements and other documents employed in any of such Defendants'

business, which reflect the business activities of Defendants, including those

described in the Complaint in this action.

## III.    FREEZING OF ASSETS

**IT IS FURTHER ORDERED** that the assets of Defendants be, and hereby

are, frozen.  The "Assets" are defined as any money, investment, property of any

kind, or any other thing of value, tangible or intangible, including those in which

one or more of Defendants has a beneficial interest that, in whole or in part, was

derived from, was acquired using, was used in connection with or otherwise related

to, or the result of, the conduct alleged in the Complaint in this action.  The freeze

shall include, but not be limited to, those funds in any bank accounts, brokerage

accounts, mutual funds, hedge funds and any other accounts or property of any

Defendant.  Defendants and their officers, directors, agents, employees, servants, managers, general and limited partners, trustees, employees, attorneys and accountants, and all persons in active concert or participation with them, except the Receiver appointed by this Court, hereby are restrained from, directly and indirectly, transferring, setting off, receiving, changing, selling, pledging, encumbering, assigning, liquidating or otherwise disposing of or withdrawing the Assets.

Any bank, brokerage firm, mutual or other fund, other financial firm and institution, or any other person, partnership, corporation or other entity maintaining or having custody or control of any of the Assets shall:

1.    freeze such Assets;

2.    within five (5) business days of receipt of such notice, file with the Court and serve on counsel for the SEC and for Defendants, a statement setting forth, with respect to such Assets, or account in which Assets are maintained, the balance in the account or the description of the Assets as of the close of business on the date of the receipt of the notice; and

3.    promptly cooperate with the Receiver and the SEC to determine whether and to what extent any accounts, funds or other assets are actually assets or proceeds of assets of any of the Defendants.

## IV.   APPOINTMENT OF RECEIVER:  GENERAL PROVISIONS

**IT IS FURTHER ORDERED** that a Receiver be appointed in this action to marshal and preserve the Assets.  Mr. Al B. Hill of Taylor English Duma LLP in Atlanta, Georgia is determined by the Court to be uniquely qualified to serve as Receiver, and he is appointed the Receiver in this matter.[41]  Mr. Hill has immediate exclusive jurisdiction and possession of the Assets, and the property, real and personal, including cash, securities, receivables and accounts, of Defendants.

If the Receiver seeks to resign his appointment as Receiver, the Receiver shall first give written notice to counsel of record in this case, and the Court, of the Receiver's request to resign.  The resignation must be approved by the Court under any terms or conditions set by the Court.

This Court shall retain jurisdiction over any action filed against the Receiver and any persons retained to assist the Receiver to perform the duties required by the Receiver.

---

[41]     Mr. Hill advises that he intends to engage lawyers at his firm to assist him to fulfill his duties as Receiver.  He has represented the hourly rates for the levels of the attorneys he expects to request to work on this engagement.  The Court finds the hourly rates for Mr. Hill and the attorneys he intends to engage to assist him are reasonable in the Atlanta market for legal services.  The Court will, at a later date, approve the engagement of his firm to provide legal services to him in connection with the Receivership.

## V.   **AUTHORITY OF THE RECEIVER**

**IT IS FURTHER ORDERED** that the Receiver shall have all the powers,

authorities, rights and privileges as those that would be exercised by the officers,

directors, managers and general and limited partners of the Defendants under state

and federal law, by the Defendants' governing charters, by-laws, articles or

agreements, in addition to all powers and authority of a receiver at equity, and

those powers conferred on a receiver under 28 U.S.C. §§ 754, 959 and 1692, and

Fed. R. Civ. P. 66.

The officers, directors, trustees, managers, general and limited partners,

employees, investment advisors, attorneys, accountants, and other employees or

agents of the Defendants (collectively, the "Managers") may be dismissed by the

Receiver, in the Receiver's discretion.  The powers and authorities of officers,

general partners, directors, managers and agents of the Defendants are suspended

upon entry of this Order.  The Managers shall not have any power or authority with

respect to the Defendants' operations or assets, until such time as power or

authority may be expressly granted by the Receiver.

The Receiver shall assume and control the operation of Defendants.  No

person other than the Receiver and those authorized by the Receiver to act on the

Receiver's behalf shall possess any authority to act by or on behalf of any of the

Defendants while this injunction is in effect.

The Receiver shall have the following general powers and duties:

1.   to use reasonable efforts to determine the nature, location and value of all Assets;

2.   to take custody, control and possession of all Assets and records relating to them; to sue for and collect, recover, receive and take into possession any Assets in the custody, possession or control of third parties.  All persons and entities having control, custody or possession of any Assets or documents relating to them are hereby directed to turn such property over to the Receiver;

3.   to manage, control, operate and maintain the Assets;

4.   to use the Assets solely for the benefit of Defendants' businesses that are the subject of the Complaint, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging the duties of Receiver;

5.   to engage and employ persons who, in the Receiver's discretion, will assist in carrying out the Receiver's duties and responsibilities, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers;

6.   to take necessary and appropriate action to preserve the Assets or to prevent the dissipation or concealment of Assets;

7.   to issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

8.   to bring appropriate legal actions allowed in state, federal, or foreign court as the Receiver deems necessary or appropriate to

discharge his duties as Receiver;

9.   to pursue and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Defendants arising out of their businesses; and

10.  to take such other action as may be approved by this Court.

## VI.   REPORTS REQUIRED

**IT IS FURTHER ORDERED** that, while this injunction is in effect, the following written reports are required:

A.   Within fourteen (14) calendar days of the entry of this Order, Defendants shall file with the Court and serve upon the Receiver and counsel for the parties a sworn statement, listing: (a) the identity, location and estimated value of all Assets; (b) all employees (and job titles thereof), other personnel, attorneys, accountants and any other agents or contractors of Defendants; and, (c) the names, addresses and amounts of claims of all known creditors and investors of the Defendants.

B.   Within thirty (30) days of the entry of this Order, Defendants shall file with the Court and serve upon the Receiver and counsel for the parties a sworn statement and accounting, with complete documentation, covering the period from **January 1, 2012**, to the present, and providing the following information:

1.    all Assets, wherever located, held by or in the name of Defendants, or in which any of them, directly or indirectly, has or had any beneficial interest, or over which any of them maintained or maintains or exercised or exercises control;

2.    every account at every bank, brokerage or other financial institution: (a) over which Defendants have signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, Defendants;

3.    all credit, bank, charge, debit or other deferred payment card issued to or used by each Defendant and their officers, directors, employees and other agents, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and with authority to use a card, the balance of each account and card as of the most recent billing statement, and all statements for the last twelve months;

4.    all Assets received by any of them from any person or entity, including the value, location, and disposition of any assets so received; and

5.    all funds received by Defendants, and each of them, in any way related, directly or indirectly, to the conduct alleged in the Complaint. The submission must clearly identify, among other things, all investors, the securities they purchased, the date and amount of their investments, and the current location of such funds; and

6.    all expenditures and transfers exceeding $1,000 made by any of them, including those made on their behalf by any person or entity.

C.    Within thirty (30) calendar days of the entry of this Order, Defendants shall

provide to the Receiver and counsel for the parties copies of Defendants'

federal income tax returns for 2012 through the present with all relevant and necessary underlying documentation.

D.      The Receiver is authorized, empowered and directed to develop a plan for the fair, reasonable, and efficient recovery and management of all remaining, recovered, and recoverable, Assets (the "Asset Plan").  Within ninety (90) days of the entry date of this Order, the Receiver shall file the Asset Plan in this action, with service copies to counsel of record.

E.      Within thirty (30) days after the end of each calendar quarter, the Receiver shall file and serve a full report and accounting of the Assets (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Assets, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of Defendants.  The Quarterly Status Report shall contain the following:

1.      a summary of the operations of the Receiver;

2.      the amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

3.      a schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the period from the inception of the receivership;

4.    a description of all known Assets, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

5.    a description of liquidated and unliquidated claims of Defendants, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

6.    a list of all known creditors and investors with their addresses and the amounts of their claims;

7.    the status of creditor and investor claims proceedings, after such proceedings have been commenced; and

8.    the Receiver's recommendations for continuation or discontinuation of the receivership, and the reasons for the recommendations.

F.    Within ten (10) days after the entry of this Order, Defendants shall file with the Court and serve upon the Receiver and counsel for the parties a list of each proceeding of any kind, including, but not limited to, administrative, civil, or criminal, in which one or more of the Defendants or their officers, directors, employees or agents is a party.  The list shall provide a detailed summary of each proceeding.

## VII. DEFENDANTS' REQUIREMENTS

**IT IS FURTHER ORDERED** that, in addition to the other requirements set out in this Order:

A.   Defendants and the past and present officers, directors, agents, managers, general and limited partners, trustees, attorneys, accountants and employees of the entity Defendants, as well as those acting in their place, are hereby ordered and directed to:

   1.   preserve and deliver to the Receiver, within ten (10) calendar days of the entry of this Order, all paper and electronic information relating to Defendants and all Assets; such information shall include but not be limited to books, records, documents, accounts and all other instruments and papers;

   2.   assist the Receiver in fulfilling the Receiver's duties and obligations. They must respond promptly and truthfully to all requests for information and documents from the Receiver; and

   3.   answer, including under oath if required by the Receiver, all questions which the Receiver may ask and produce all documents required by the Receiver regarding the business of Defendants, or any other matter relevant to the operation or administration of the receivership or the collection of funds due to Defendants. The questions may be asked in writing or by any means allowed by the Federal Rules of Civil Procedure.

B.   Any persons acting for or on behalf of Defendants, and any persons receiving notice of this Order by personal service, facsimile transmission or otherwise, having possession of the property, business, books, records,

82

accounts or assets of the Defendants are hereby directed to promptly contact

the Receiver to discuss delivery of such records to the Receiver.

## VIII. FINANCIAL INSTITUTION REQUIREMENTS

**IT IS FURTHER ORDERED** that all banks, brokerage firms, financial

institutions, and other persons, corporations, partnerships or entities which have

possession, custody or control of any Assets in the name or for the benefit, directly

or indirectly, of Defendants that receive actual notice of this Order by personal

service, or any other means shall:

1. not liquidate, transfer, sell, convey or otherwise transfer any
   assets, securities, funds, or accounts in the name of or for the
   benefit of Defendants except upon instructions from the
   Receiver;

2. not exercise without the permission of the Court, any form of
   set-off, alleged set-off, lien, or any form of self-help
   whatsoever, or refuse to transfer any funds or assets to the
   Receiver's control;

3. within seven (7) calendar days of receipt of that notice, file with
   the Court and serve on the Receiver and counsel for the parties
   a statement setting forth, with respect to each such account or
   other asset not identified pursuant to Section III above, the
   balance in the account or description of the assets as of the
   close of business on the date of receipt of the notice; and

4. cooperate immediately to provide information and to transfer
   funds, assets and accounts to the Receiver or at the direction of
   the Receiver.

## IX.   <u>INTERFERING WITH RECEIVER</u>

**IT IS FURTHER ORDERED** that Defendants and all persons receiving notice of this Order by personal service, or any other means, are hereby restrained and enjoined from directly or indirectly taking any action, or causing any action to be taken, without the express written agreement of the Receiver, which would:

1. interfere with the Receiver's actions to take control, possession, or management of any Assets; such prohibited actions include but are not limited to, using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Assets;

2. hinder, obstruct or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include, but are not limited to, concealing, destroying or altering records or information;

3. dissipate or otherwise diminish the value of any Assets; such prohibited actions include but are not limited to, releasing claims or disposing, transferring, exchanging, assigning, encumbering, or in any way conveying any Assets, enforcing judgments, assessments or claims against any Assets or any Defendant, attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement executed by any Defendant or which otherwise affects any Assets; or

4. interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Assets.

The Receiver shall promptly notify the Court and counsel of record of any

failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

## X.    RECEIVER COMPENSATION

**IT IS FURTHER ORDERED** that the Receiver is entitled to reasonable compensation and expense reimbursement from the Assets.  Compensation payable to the Receiver shall be reasonable and appropriate as determined by the Court.

A.    The Receiver shall apply, on or before the first day of each month, to the Court for compensation and expense reimbursement from the Receivership Estates (the "Monthly Fee Applications").  Each Monthly Fee Application shall:

1.    comply with the terms of compensation agreed to by the Receiver; and,

2.    contain representations that:  (i) the fees and expenses included therein were incurred in the best interests of Defendants; and, (ii) with the exception of the agreement entered into with the Court, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

B.    Monthly Fee Applications will be interim.  At the conclusion of the Receiver's duties, as determined by the Court, the Receiver will file a final fee application (the "Final Fee Application").

C.      Monthly Fee Applications may be subject to a holdback up to 20% of

the fees and expenses approved by the Court upon the submission of

each Monthly Fee Application.  The amounts held back during the

course of the receivership will be considered for payment by the Court

as part of the Final Fee Application.

At the termination of the Receiver's duties, as determined by the Court, the

Receiver shall submit a Final Accounting, in a format to be approved by the Court.

## XI.    TERM OF THE PRELIMINARY INJUNCTION

The purpose of this Preliminary Injunction is to maintain the status quo

while the Court considers whether to enter a permanent injunction in this matter.

As a result, this Preliminary Injunction will be in effect at least until a judgment is

entered in this case.

Counsel for the parties shall immediately send a copy of this Order and

Injunction to each person that they know, or reasonably should know, has

possession, custody and control of any of the Assets, including, but not limited to

banks, brokerage firms, mutual or other funds, and other financial institutions and

firms.

## XII.  STATUS CONFERENCE

**IT IS FURTHER ORDERED** that the Court shall hold, on Wednesday,

May 11, 2016, at 10:00 am, a telephonic status conference with counsel for the

parties and the Receiver.  Counsel and the Receiver are required, before the status

conference, to confer and submit to the Court their joint summary of any disputes

or potential disputes regarding the scope or application of this Order, or any

practical issues or considerations regarding the enforcement and execution of this

Order.

**SO ORDERED** this 25th day of April, 2016.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

# Exhibit "C"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

v.

JAMES A. TORCHIA, CREDIT
NATION CAPITAL, LLC, CREDIT
NATION ACCEPTANCE, LLC,
CREDIT NATION AUTO SALES,
LLC, AMERICAN MOTOR
CREDIT  LLC, AND SPAGHETTI
JUNCTION, LLC,

    Defendants.

Civil Action File No.
1:15-cv-3904-WSD

## ORDER REAPPOINTING AL HILL AS RECEIVER

Whereas Plaintiff has moved this Court to reappoint Al Hill as receiver in this matter, and no opposition to that motion has been filed, and for good cause shown, it is hereby **ORDERED** that Al Hill is reappointed as the receiver in this action on the same terms as set forth in the Court's order of April 25, 2016 [Dkt. 66].  All orders subsequent to April 25, 2016 that address the scope of the receivership, the authority of the receiver, or the disposition of receivership assets shall continue to apply and remain in full effect.

1

**SO ORDERED** this 2nd day of December 2016.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

2